**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**SCOTT TAYLOR & COMPANY, Inc., Stephen N. Stevens, Theodore Landau, d/b/a Landau Company, Defendants.**

United States District Court
S. D. New York.
Dec. 15, 1959.

See also 25 F.R.D. 47.

Paul Windels, Jr., New York City, for Securities and Exchange Commission.

Germaise & Frietag, Arnold D. Naidich, New York City, for defendant Landau.

McNabb, Sommerfield, & James, New York City, for Scott Taylor.

BICKS, District Judge.

The Securities and Exchange Commission has moved for an injunction pending final determination of this action or until further order of this Court. The Commission seeks to enjoin Scott Taylor & Company, Inc., Stephen N. Stevens, and Theodore Landau, doing business as Landau Company, from, directly or indirectly, making use of any means or instrumentality of interstate commerce or of the mails to offer to sell or sell shares of the common stock of Anaconda Lead & Silver Company in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and Rule X–10B–6, 17 C.F.R. 240.10b–6 adopted thereunder.

From the end of April, 1959 to August 18, 1959, the date on which the complaint in this action was filed, Scott Taylor & Company through Stephen N. Stevens, officer, director and owner of the company, offered for sale and sold stock of Anaconda Lead & Silver Company by the use of the mails and other instrumentalities of interstate commerce to residents of various states and in connection with these offers for sale and sales sent stock certificates and other papers through the mails.

Anaconda Lead & Silver Company was organized under Nevada law in 1948 and has its offices in Denver, Colorado. The company has not been in operation nor

has it had any income since 1952. The books of the company have not been posted since 1953. There are slightly more than 7,000,000 shares of common stock outstanding.

In April or May, 1959 Stevens went to Denver and spoke with Harold P. Waite, the President of Anaconda Lead & Silver, and Karl W. Farr, Jr., the attorney for the company as well as President of the Bankers *Transfer* Company,[1] Denver, Colorado, transfer agents for the securities of Anaconda Lead & Silver Company. Both Mr. Waite and Mr. Farr had sizable holdings of the company's common stock. Stevens asked whether the shares of Anaconda Lead & Silver would be worth as much as $4.50 per share. Both Mr. Waite and Mr. Farr explained that the company was being reorganized and that its stock was worth from 25 to 40 cents for trading purposes.

In the course of sales to numerous customers, Stevens, on behalf of himself and as an officer of Scott Taylor, made and caused to be made certain statements which are the basis for the action under Section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a). Some customers were told that Anaconda Lead & Silver Company was a subsidiary of Anaconda Copper (The Anaconda Company). Other customers were told that Anaconda Lead & Silver was controlled or backed by Anaconda Copper. One customer was informed that the Dow Chemical Company was interested in Anaconda Lead & Silver. Said statements were false and untrue to the knowledge of Stevens. Each of these untrue statements constitutes a violation of Section 17(a).[2]

Numerous other alleged false statements have been ascribed to Stevens, which, in view of the material misrepresentations set forth supra, need not be dealt with.

The Commission alleges further that the defendants violated Rule X–10B–6,[3] promulgated under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), which statutory section proscribes "manipulative or deceptive" devices or contrivances.[4] Manipulative and deceptive are defined in Rule X–10B–6 as including those transactions in which a person who participates in the

1. Emphasis supplied to avoid confusion with Bankers Trust Co., New York City.

2. The applicable portion of Section 17(a) provides that:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails * * *

"(2) to obtain money or property by means of any untrue statement of a material fact * * *."

3. "(a) It shall constitute a 'manipulative or deceptive device or contrivance' as used in section 10(b) of the act for any person.

"(1) Who is an underwriter or prospective underwriter in a particular distribution of securities, or

"(2) Who is the issuer or other person on whose behalf such a distribution is being made, or

"(3) Who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution * * *".

4. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails * * *

"To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

distribution of securities, directly or indirectly bids for the securities of the same class or purchases them for an account in which he has a beneficial interest.

██ Manipulation was one of the basic evils with which Congress was concerned in enacting statutes to regulate the securities market. See Securities Exchange Act of 1934, Section 2(3). Manipulation was often accomplished by those about to sell securities or already engaged in selling securities bidding on the market for the same securities, thereby creating an unjustifiable impression of market activity which would facilitate the sale at artificially high prices.[5] This was one of the practices which the Securities Exchange Act was designed to eradicate, and it is the practice which is covered by Rule X-10B-6.

The Commission urges that the defendants from March 1, 1959, to August 18, 1959, the date on which the complaint was filed, distributed upwards of 30,000 shares of Anaconda Lead & Silver stock, and that while distributing the stock and before they completed their participation in the distribution, defendants Stevens and Scott Taylor caused the defendant Landau to insert bids in the National Daily Quotation Sheets.[6]

The facts disclosed in the affidavits support the Commission's position. Scott Taylor purchased 33,000 shares of Anaconda Lead & Silver stock from or through Landau and sold the stock to the public.[7] The 33,000 shares were sold by Scott Taylor from the end of April, 1959 to August 4, 1959, at prices ranging from $4.25 to $4.75. From April 30, 1959, through August 7, 1959, Landau listed bids for the stock in the National Daily Quotation Sheets on every business day but one, at prices ranging from $4 to $4.25 until the end of July when some bids below this level were made. Although other firms listed bids for the stock, none listed them as persistently as did Landau. April 30, 1959, was the first time Landau placed bids with respect to Anaconda Lead & Silver Company in the quotation sheets, and he did so pursuant to an order from Scott Taylor to purchase shares for its account. The inevitable effect of Landau's daily bidding was to create an unwarranted impression of interest and activity in Anaconda Lead & Silver stock.

██ Stevens' and Scott Taylor's activities come within the prohibitions of Rule X-10B-6 as involving a "broker, dealer, or other person who has agreed to participate or is participating in" a

5. Loss, Securities Regulation, 883-884 (1951).

"In finding violations of anti-fraud sections of the securities statutes, the Commission illustrated this technique of manipulation: A manipulation may be accomplished without wash sales, matched orders or other fictitious devices. Actual buying with the design to create activity, prevent price falls, or raise prices for the purpose of inducing others to buy is to distort the character of the market as a reflection of the combined judgments of buyers and sellers, and to make it a stage-managed performance. Matter of Halsey Stuart & Co., 30 SEC 106, 112 (1949)."

6 "The National Daily Quotation Sheets contain bids and offers which are inserted by licensed brokers and dealers. A bid in these sheets indicates a willingness of the bidder to trade with other brokers or dealers, although it is not a firm commitment. These sheets are circulated only among brokers and dealers, but they also form the basis for customer interest and activity in the securities listed therein." Loss, supra, at 710-713.

"Whatever limitations there may be on the sheets as a method of communicating bids and offers among dealers there is no doubt that they indicate the approximate range within which sales may be and are effected * * * Thus, the listings are commonly understood to have a serious meaning and business purpose. They are steps in sales negotiations and, at the very least, invitations to negotiate sales * * *. Moreover, prices paid in the dealer market have a direct bearing on prices paid by investors." Matter of Halsey Stuart & Co., supra, at 126-128.

7. Of the specific sales set forth in the affidavits, over 5,000 shares were sold in 14 sales to persons residing in 13 different states.

particular distribution of securities. The stock sold to the public by Scott Taylor was an aggregate of approximately 33,000 shares. These sales constituted a "distribution" within Rule X–10B–6.[8]

At the same time that Stevens and Scott Taylor were engaged in distributing Anaconda Lead & Silver securities they caused Landau to insert bids in the National Daily Quotation Sheets. Stevens and Scott Taylor thereby violated Rule X–10B–6, even though the bids were made indirectly.[9]

As already indicated, other firms bid for Anaconda Lead & Silver stock and, indeed, it would appear that Landau was not the first to cause a bid for the stock to be published in the National Daily Quotation Sheets. The published bids on the respective dates on which more than one bid appeared were approximately at the same price. It cannot be contended that the conformity of Landau's bids to the other published bids exempts the transactions in question from the coverage of Rule X–10B–6. Rule X–10B–6 deals with such bids in conformity with the general market by specifically excluding from its coverage stabilizing bids allowed under Rule X–10B–7.[10] The clear inference is that all other bids at the market are covered by Rule X–10B–6, since the support of an existing market may be as misleading as the advance of an existing market. Landau's bids were not stabilizing bids in conformity with Rule X–10B–7 and come clearly within the interdiction of Rule X–10B–6.

■ Landau acted in concert with Stevens and Scott Taylor in a joint venture to distribute the Anaconda Lead & Silver stock and to bid for it at the same time for manipulative purposes proscribed by Section 10(b). As might be expected in cases of this type, there is no direct evidence of an agreement between Scott Taylor and Stevens on the one hand and Landau on the other to engage in this joint venture. But circumstantial evidence is competent to prove the necessary agreement.[11] The circumstantial evidence here clearly establishes such a common concert, plan or agreement.

Around February, 1959, a Mr. Fred Hesse sold to Landau's wife 2,500 shares of Anaconda Lead & Silver stock at a price of 40 cents per share. It is inescapable from the papers considered on this motion that Landau was the instrumentality from or through whom Scott Taylor acquired the securities which it offered and distributed to the public and that Landau knew that the securities so supplied to Scott Taylor would be thus

---

8. See the Commission's statement in Matter of Gobs Shops of America, Inc., Securities Act Release No. 4075, Washington, D.C., May 6, 1959.

"Brun's market activity may also have constituted a manipulative device within the meaning of our Rule 10b–6 under the Securities Exchange Act of 1934. That rule declares it to be a manipulative device for a broker or dealer who is participating in a distribution to bid for or purchase for its own account any security which is the subject of such distribution. For purposes of that rule, the distribution need not be effected by an underwriter as defined in Section 2(11) of the Securities Act, that is, by a person who has purchased from or sells for an issuer or controlling person. It is enough if the broker or dealer is engaged in a distribution in the sense of a major selling effort in his own behalf." See also Foshay, Market Activities of Participants

in Securities Distributions, 45 Va.L.Rev. 907, 920 (1959).

9. Persons covered by Rule X–10B–6 may not bid for securities of the same class "directly or indirectly * * * either alone or with one or more other persons."

10. *"Provided, however,* That this section shall not prohibit * * * (viii) stabilizing transactions not in violation of § 240.10b–7 * * * "*.

11. See Matter of Halsey Stuart & Co., supra, at 112:

"There is, of course, no subjective evidence of purpose to manipulate in this case and such purpose has been denied. But the facts of the case raise a compelling inference of motive to support or raise the market * * * Active trading in this situation subjected Halsey to the reasonable interpretation that its transactions in fact supporting the market, or raising prices, were undertaken * * * for a manipulative purpose."

offered and distributed. He thereby facilitated and furthered the distribution.

■■ The Court finds that Landau "participated in the distribution" within the meaning of Rule X–10B–6 and that, being a participant in the distribution of the securities, Landau violated Rule X–10B–6 when he bid regularly in the National Daily Quotation Sheets for Anaconda Lead & Silver securities.[12]

The Court has considered each of the exceptions specified in Rule X–10B–6 and finds that the defendants' activities fall within none of these exceptions.

■ Stevens and Scott Taylor have violated Section 17(a) of the Securities Act of 1933. Stevens, Scott Taylor and Landau have violated Section 10(b) of the Securities Exchange Act of 1934 and Rule X–10B–6 adopted thereunder.

■■ The defendants claim that they have ceased trading in the securities of Anaconda Lead & Silver Company, that they will not commence to sell these securities again, and therefore that a preliminary injunction should not be granted. Security and Exchange Comm. v. Culpepper, 2 Cir., 1959, 270 F.2d 241, 249, made it clear that "the appellants' cessation of their illegal activities prior to the commencement of this action would not preclude the issuance of an injunction * * *. The critical question for the court in cases such as this is whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby." The Court finds that there is a reasonable expectation that the defendants will commit further violations of the sections of the statutes and the regulation involved in this case unless an injunction is granted.

■ Stevens argues that the Commission may revoke his broker-dealer registration if a preliminary injunction is granted. But, as the Court of Appeals has said, "considerations of the possible effects of this injunction in future revocation proceedings * * * are not germane to our determination here." S. E. C. v. Culpepper, supra, 270 F.2d at page 252.

The foregoing shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a), 28 U.S.C.A.

It is hereby ordered, adjudged and decreed that the defendants Stephen N. Stevens and Scott Taylor Company, Inc., their officers, agents, servants, employees, attorneys and successors and each of them, and all persons or corporations acting under their direction or on their behalf, be and they hereby are enjoined and restrained, pending the final determination of this action or the further order of this Court, from directly or indirectly:

Obtaining money or property by means of any untrue statement of a material fact concerning any connection between the Anaconda Lead & Silver Company and the Anaconda Copper Company or concerning any interest of Dow Chemical Company in the Anaconda Lead & Silver Company or any other untrue statement of similar purport in the offer or sale of the common stock of Anaconda Lead & Silver Company by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails.

It is further ordered, adjudged and decreed that the defendants Stephen N. Stevens, Scott Taylor & Company, Inc., Theodore Landau, doing business as Landau Company, their officers, agents, servants, employees, attorneys and successors and each of them, and all persons or corporations acting under their direction or on their behalf, be and they hereby are enjoined and restrained, pending

---

12. Wholly apart from Landau's participation in the distribution within the meaning of Rule X–10B–6, he aided and abetted the other defendants' violations of Rule X–10B–6 and is therefore liable as a principal. See Matter of Burley & Co., 23 SEC 461 (1946); SEC v. Timetrust, Inc., D.C.N.D.Cal.1939, 28 F. Supp. 34, appeal dismissed on stipulation, 9 Cir., 1941, 118 F.2d 718; Loss, supra, at 846, n. 119.

the final determination of this action or until further order of the court, from directly or indirectly using any means or instruments or communication in interstate commerce or of the mails, in inserting or causing to be inserted bids for the securities of the Anaconda Lead & Silver Company in the National Daily Quotation Sheets so long as they or any of them are participating in a distribution of the securities of that company.