**CHRIS–CRAFT INDUSTRIES, INC.,**
Plaintiff-Appellant,

v.

**BANGOR PUNTA CORPORATION and David W. Wallace, Defendants-Appellees.**

No. 249, Docket 33983.

United States Court of Appeals, Second Circuit.

Submitted to the court *in banc* Feb. 2, 1970.*

Decided April 28, 1970.

* Argued on September 19, 1969 before a division of the court composed of Chief Judge Lumbard and Judges Waterman and Kaufman. After the filing of panel opinions on November 6, 1969 a petition for rehearing with suggestion that the full court also rehear the case was timely filed. The division denied the rehearing petition as of January 12, 1970, but a rehearing *in banc* was then granted, the *in banc* reconsideration to be had without further oral argument. The parties were granted permission to file further briefs on or before February 2, 1970.

Arthur L. Liman, Joseph J. Ackell, Alan L. Schlosser, Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for plaintiff-appellant.

James V. Ryan, William L. D. Barrett, Nancy L. Pasley, Webster, Sheffield, Fleischmann, Hitchcock & Brookfield, New York City, for defendants-appellees.

Paul G. Pennoyer, Jr., Zachary Shimer, Irene Conrad Warshauer, Chadbourne, Parke, Whiteside & Wolff, New York City, for Piper Aircraft et al.

Philip A. Loomis, Jr., General Counsel, David Ferber, Sol., Meyer Eisenberg, Associate General Counsel, Harvey A. Rowen, Attorney, Securities & Exchange Commission, amici curiae.

Before LUMBARD, Chief Judge, WATERMAN, MOORE, FRIENDLY,** SMITH, KAUFMAN, HAYS, ANDERSON and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge:

Plaintiff-appellant, Chris-Craft Industries, Inc., appeals from the denial of an order entered below in the United States District Court for the Southern District of New York denying appellant's motion for a preliminary injunction to restrain Bangor Punta Corporation from gaining and exercising control of Piper Aircraft Corporation pending a trial on the merits of whether certain shares of Piper were acquired by Bangor Punta in violation of governing Rules of the Securities and Exchange Commission. We affirm the denial of the preliminary injunction but remand the case to the district court for further proceedings there not inconsistent with the within opinion.

This litigation comes at the end of a hard fought battle between Chris-Craft

---

** After the nine active judges decided to rehear the case *in banc* Judge Friendly refrained from any further participation in the disposition of the case.

Industries and Bangor Punta Corporation for control of Piper Aircraft Corporation. The contest opened in January 1969 when Chris-Craft began to acquire Piper shares on the open market. At that time Piper had 5,000,000 authorized shares of $1.00 par common stock of which 1,641,890 shares were issued and outstanding. In January 1969 Chris-Craft made a public exchange offer for 300,000 Piper shares, and by February these efforts had gained Chris-Craft 34 per cent of the then outstanding Piper stock. On February 27, 1969, Chris-Craft filed with the Securities and Exchange Commission a registration statement and proposed prospectus for an exchange offer for an additional 300,-000 shares. Still another exchange offer was announced by Chris-Craft on May 7 and became effective July 24.

Chris-Craft's bid for control met strong resistance from the Piper family and Piper management, who owned 501,-090 shares (31 per cent of the outstanding shares), and considered Chris-Craft to be a corporate raider. The management advised other Piper shareholders that Chris-Craft's tender offer was inadequate but offered 300,000 of Piper's authorized but unissued shares to Grumman Aircraft Corporation at the same price that Chris-Craft had offered. Although this transaction was never consummated, Piper initially advertised that Grumman had agreed to purchase the Piper shares and the court below noted that Chris-Craft's tender offer was adversely affected by this publicity.

Subsequently, on March 22, the Piper management issued 469,199 shares of authorized but unissued stock to acquire control of two subsidiary corporations, United States Concrete Pipe Company of Florida and Southply, Inc. Piper failed to seek the approval of the New York Stock Exchange and of its own shareholders as its listing agreement with the Exchange provided it should before issuing a significant new block of stock. Therefore, the Exchange refused to approve Piper's listing application. When the Exchange shortly afterward suspended trading in Piper shares and authorized proceedings before the SEC to delist Piper, Piper rescinded both transactions and trading in its shares was resumed.

At this juncture, in April 1969, the Piper family resumed talks which had begun as early as January with Bangor Punta Corporation. These negotiations bore fruit on May 8, when the two groups agreed that the family would exchange its 501,090 shares for specified Bangor Punta securities. Bangor Punta agreed in addition to use its best efforts to acquire enough additional Piper shares to make it the holder of more than 50% of the shares outstanding. As part of these best efforts, Bangor Punta agreed to make an exchange offer to all Piper shareholders "under which such holders will be entitled to exchange each share of Piper common stock held by them for Bangor Punta securities and/or cash having a value, in the written opinion of The First Boston Corporation, of $80 or more." If Bangor Punta succeeded in acquiring 50% or more of the stock, the consideration paid by Bangor Punta would be increased to make up to the Piper family the difference, if any difference there were, between the value of the package specified in the agreement and $80 per share.

The two occurrences which form the basis of Chris-Craft's complaint followed the negotiation of this contract. The first of these occurrences was the issuance by Bangor Punta and the Piper management of press releases announcing the transaction on May 8, the day the contract was signed and the day after Chris-Craft announced the terms of its second exchange offer. After stating that the Piper family would receive Bangor Punta securities for their shares, the Bangor Punta press release continued as follows:

> Bangor Punta has agreed to file a registration statement with the SEC covering a proposed exchange offer for any and all of the remaining outstanding shares of Piper Aircraft for a package of Bangor Punta securities

to be valued in the judgment of The First Boston Corporation at not less than $80 per Piper share. The registration statement covering all securities to be issued will be filed as soon as possible and a meeting of the shareholders of Bangor Punta Corporation will be called for approval.

Mr. Piper said that in view of Bangor Punta's long-standing policy of maintaining autonomy in the management of its operating companies, and the similarity of operating philosophies between the two companies, he and the Piper family would strongly support the merger and would recommend it to all shareholders.

Mr. Wallace said Bangor Punta welcomed the association with Piper Aircraft, its world-wide distribution, and its prestigious product name. He said the consolidation would align the Piper Aircraft name with other leading Bangor Punta companies, including Smith & Wesson, Starcraft Company, and Waukesha Motor Company.

Bangor Punta manufactures a wide variety of recreational vehicles including sailboats, houseboats, snowmobiles, campers, trailers and motor homes. A merger of Bangor Punta and Piper Aircraft would bring Bangor Punta into the light aircraft manufacturing business.

Sales of the combined companies would reach $450,000,000 in fiscal 1969, with approximately $180,000,000, or 40%, in the aircraft, recreational and leisure time fields.

Piper Aircraft Corporation simultaneously issued a similar press release.

These announcements attracted an immediate response from the Securities and Exchange Commission, which felt that the release constituted an offer to sell securities before any registration statement had been filed. Accordingly the SEC instituted an action against Bangor Punta and Piper in the United States District Court for the District of Columbia on May 26, and on the same day the defendants consented to the entry of judgment and the issuance of an injunction prohibiting further releases of a similar nature before Bangor Punta's registration statement and prospectus were filed.

The second occurrence or set of occurrences of which Chris-Craft complains took place between May 14 and May 23, when Bangor Punta purchased 120,200 shares of Piper stock for cash in private transactions. Chris-Craft alleges that on April 7, 1969, the staff of the SEC warned Chris-Craft's top executives that continued cash purchases of Piper stock while Chris-Craft's own exchange offer was outstanding, as the first one then was, would be regarded by the SEC as a violation of Rule 10b–6, which prohibits an issuer from purchasing securities while still participating in their distribution. Chris-Craft did refrain from further purchases during the remainder of its first tender offer and all of its second. Bangor Punta's purchases of stock between May 14 and May 23 occurred while its exchange offer was outstanding if one assumes that the May 8 press release constituted an offer to sell, as the SEC charged that it did. Bangor Punta states that although the SEC knew of its cash purchases at the time the consent decree was discussed, May 23 to May 26, the SEC nonetheless failed to challenge these purchases or ask for their rescission. However, it is undisputed that the SEC announced publicly its position on such purchases in a press release issued May 5.

Bangor Punta's exchange offer closed on July 29, and Chris-Craft's second offer ended August 4. At that time Bangor Punta held 45% of Piper's stock, and Chris-Craft held 40%. By the time this case came to argument on appeal, Chris-Craft had increased its holdings to 46.2% of Piper's common stock, while Bangor Punta had finally acquired a majority with 52.7%.

Chris-Craft commenced the present lawsuit on July 22, 1969, seeking a preliminary injunction which would order Bangor Punta (1) to offer the right to rescind to all persons who had tendered

Piper shares to Bangor Punta pursuant to its exchange offer, (2) to refrain from acquiring further Piper shares, (3) to refrain from effecting a merger of Piper and Bangor Punta, and (4) to refrain from voting the 120,200 Piper shares acquired for cash between May 16 and May 23, 1969. The district court denied Chris-Craft's motion for a preliminary injunction, citing both the lack of any irreparable injury to Chris-Craft if the motion were denied and the lack of any illegal behavior on the part of Bangor Punta. Chris-Craft then sought and received an expedited appeal to this court.

### The Preliminary Injunction

■ We agree with the district court that a preliminary injunction is not warranted. A preliminary injunction should issue only when it is needed "as an equitable policing measure to prevent the parties from harming one another during the litigation," Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2 Cir. 1953). It is apparent that here there is no threat that unless an injunction issues before trial "the plaintiff will suffer harm which cannot be repaired." Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2 Cir. 1966). Counsel for Bangor Punta has orally stipulated at argument that no merger between that company and Piper will be effected before the end of this litigation, so that no injunction restraining a merger is needed. We do not see, and Chris-Craft does not suggest, what other irreparable harm might result from Bangor Punta's voting the 120,200 shares acquired for cash in May.

■ Absent any such prejudice from the voting of the stock we do not see how harm to plaintiff can result from refusing to order before the merits of the case are adjudicated after a trial a divestiture or rescission of stock acquired by Bangor Punta during its exchange offer. Indeed, to "give to a plaintiff all the actual advantage which could be obtained by the plaintiff as a result of a final adjudication of the controversy in favor of the plaintiff" would be clearly inequitable under such circumstances. Selchow & Richter Co. v. Western Printing & Lith. Co., 112 F.2d 430, 431 (7 Cir. 1940). We also understand counsel for Chris-Craft to admit on oral argument that because of its complexity an order for rescission or divestiture should be worked out only at trial.

■ Finally, we conclude that the district court did not err in refusing to enjoin the continued solicitation of stock by Bangor Punta. At that time Chris-Craft was free to compete equally with Bangor Punta for the remaining Piper shares, and it did so. We do not understand Chris-Craft to allege that prior misdeeds of Bangor Punta so determined the course of the competition for shares after the date of the decision below that Chris-Craft was placed at any real disadvantage. Consequently, we affirm the denial of the preliminary injunction.

However, we also feel compelled to pass on the district court's alternative holding that Bangor Punta did not violate the securities laws, for it is clear that this ruling below would determine the outcome of the trial on the merits. On this issue we disagree with the district court.

### The May 8 Press Releases

Section 5(c) of the Securities Exchange Act of 1933, as amended, states in part that:

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, * * *.

Section 5(b) of the Act provides that offers to sell may be made after the registration statement is filed, but before it becomes effective, provided the offers are made by specified means which in-

clude the use of a prospectus meeting the requirements of Section 10.

The Securities and Exchange Commission has promulgated Rule 135 to exempt certain disclosures of forthcoming issuances from the definition of an "offer to sell" prohibited by Section 5(c). This Rule reads in relevant part as follows:

(a) For the purposes only of section 5 of the Act, the following notices sent by an issuer in accordance with the terms and conditions of this rule shall not be deemed to offer any security for sale:

\* \* \* \* \* \*

(2) A notice to any class of security holders of such issuer or of another issuer advising them that it proposes to offer its securities to them in exchange for other securities presently held by such security holders;

\* \* \* \* \* \*

(b) Such notice shall be sent not more than 60 days prior to the proposed record date for determining the security holders entitled to subscribe to the securities or, if there is no such record date, not more than 60 days prior to the proposed date of the initial offering of the securities.

(c) The notice shall state that the offering will be made only by means of a prospectus which will be furnished to such security holders or employees, as the case may be, and shall contain no more than the following additional information:

(1) The name of the issuer;

(2) The title of the securities proposed to be offered;

\* \* \* \* \* \*

(4) In the case of an exchange offering, the name of the issuer and the title of the securities to be surrendered in exchange for the securities to be offered, the basis upon which the exchange is proposed to be made and the period during which the exchange may be made, or any of the foregoing;

\* \* \* \* \* \*

(6) Any statement or legend required by State law or administrative authority.

■ Chris-Craft argues, and the argument is supported by the SEC, both in its action filed May 26 against Bangor Punta and in its *amicus curiae* brief in this court, that the categories of information privileged under the Rule are exclusive. In view of this exclusivity they contend that as the rule does not mention disclosure of the value of the securities to be offered, Bangor Punta's and Piper's announcements that the package of securities offered by Bangor Punta would be valued at $80 oversteps the exemption and makes the press release an offer to sell.

We agree with this contention. When it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished, it seems clear that such an announcement provides much the same kind of information as that contained in a prospectus. See SEC v. Arvida Corp., 169 F.Supp. 211 (S.D.N.Y.1958). Doubtless the line drawn between an announcement containing sufficient information to constitute an offer and one which does not must be to some extent arbitrary. A checklist of features that may be included in an announcement which does not also constitute an offer to sell serves to guide the financial community and the courts far better than any judicially formulated "rule of reason" as to what is or is not an offer. Rule 135 provides just such a checklist, and if the Rule is not construed as setting forth an exclusive list, then much of its value as a guide is lost.

Moreover, it is reasonable to conclude that the assigning of a value to offered shares constitutes an offer to sell. One of the evils of a premature offer is its tendency to encourage the formation by the offeree of an opinion of the value of the securities before a registration statement and prospectus are filed.

There is then no information on file at the SEC by which the Commission can check the accuracy of the information which forms the basis of the offeror's estimate of value, and any offeree, such as the reader of a press release, is encouraged to form a premature opinion of value without benefit of the full set of facts contained in a prospectus.

Here a statement of the value of the securities Bangor Punta offered was made directly in the announcement. It is true that the value which the reader of the May 8 press releases could be expected to accept is a value based upon the opinion of a reputable financial corporation and not upon general and necessarily speculative facts about the nature of the offeror's business, as in *Arvida*, *supra*. However, the true significance of the $80 value which Bangor Punta claimed for its securities package was nonetheless unclear. Chris-Craft charges that the figure constituted an outright misrepresentation inasmuch as most readers would construe the figure as representing the market value of the package. In fact, Chris-Craft charges, some of the securities in the package had not previously been sold on the market at all, and the market value of Piper shares never reached $80 in response to the Bangor Punta exchange offer, so that the Bangor Punta securities did not have an $80 market value and could not honestly have been thought to have such a value. We need not reach the question whether prudent investors would have so construed the $80 value or whether it would have been assumed, as was apparently the case, that the value referred to was based on such considerations as Bangor Punta's earnings and asset value as well as upon the sales price of the securities. It is enough to point out that under either construction the SEC had no way of checking the honesty of the figure, and that the public did not receive the detailed information it would have received from a prospectus issued after a registration statement had been filed. Such information would have eliminated the possibility, perhaps the probability, that some persons would have construed the $80 figure as referring to market value when that value was neither accurate nor intended.[1]

Bangor Punta and Piper argue that even prior to the filing of a registration statement an immediate disclosure of market value is compelled in cases such as this both by SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2 Cir. 1968), cert. denied as to issues not pertinent here, sub nom. Coates v. SEC, Kline v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), and by the rules of the New York Stock Exchange. We do not agree. The only material fact in this case within the meaning of *Texas Gulf Sulphur* was Bangor Punta's commitment to offer its securities for Piper Aircraft shares. Rule 135 provides adequately for the announcement of a material fact such as this; further disclosure would, as stated above, thwart other policies of the securities laws. Had Bangor Punta observed Rule 135 by revealing immediately its intention to make an exchange offer and by later revealing the titles of the securities it proposed to offer and the basis or ratio on which the exchange was proposed to be made as soon as these matters were decided, adequate information concerning the proposed transaction would have been placed before the public and the potentially misleading estimate of value would have been avoided.[2] Even if we assume that knowledge of the value figure involved here might conceivably have conferred some benefit on insiders had it not been revealed, we feel that this risk of unfair advantage is outweighed by the danger that substantial numbers of investors were misled by the figure's publication. The fact that a few additional sophis-

---

1. The prospectus which Bangor Punta later issued contained a complete description of the securities it was offering for Piper stock, including the over-the-counter sales price of those securities to which such a price was applicable.

2. See, generally, SEC Release No. 33–5009 (Oct. 7, 1969).

ticated investors could have discovered the $80 value guarantee in the description of the transaction which Bangor Punta filed with the SEC pursuant to Section 13(d) of the 1934 Act is of no moment. Such investors would almost certainly be small in number, and any arguable danger of permitting them an unfair advantage is outweighed by the stronger probability that the press release misled a large number of unsophisticated investors.

■ The same principles apply to the New York Stock Exchange's requirement [3] that insiders disclose information likely to affect the market unless such information can be restricted to a small group of top management officials. In any event, a policy of the New York Stock Exchange, although entitled to considerable respect, cannot bind the Commission or the courts. Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). To hold that disclosure would be privileged here because the $80 value could not be kept secret and might affect the market would mean that many other companies could offer to sell securities before their registration by claiming that the terms of the proposed offer could not be kept totally secret and must therefore be disclosed in full. Consequently we hold that the May 8 press release by Bangor Punta violated Section 5(c) and therefore we remand the action to the district court for it to consider in light of this opinion and with the benefit of any further evidence which the parties may present at trial what the most suitable remedy for the violation might be.

### Bangor Punta's Purchases of Stock During Its Exchange Offer

Rule 10b-6 forbids "any person * * * (2) who is the issuer or other person on whose behalf * * * a distribution is being made * * * to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution * * * or any right to purchase any such security. * * * "

On May 5, 1969, before the purchases of which Chris-Craft complains, the SEC issued release No. 34–8595, announcing a proposed Rule 10b–13. This Rule, which did not become effective until November 10, 1969, reads in part as follows:

(a) No person who makes a cash tender offer or exchange offer for any equity security shall, directly or indirectly, purchase, or make any arrangement to purchase, any such security (or any other security which is immediately convertible into or exchangeable for such security), otherwise than pursuant to such tender offer or exchange offer, from the time such tender offer or exchange offer is publicly announced or otherwise made known by such person to holders of the security to be acquired until the expiration of the period, including any extensions thereof, during which securities tendered pursuant to such tender offer or exchange offer may by the terms of such offer be accepted or rejected; * * *.

The SEC announced in the same release that Rule 10b–13 served only to restate law which already existed:

This provision is, in effect, a codification of existing interpretations under Rule 10b–6, which among other things, prohibits the person making a distribution from bidding for or purchasing the security being distributed or any right to acquire that security. These interpretations have pointed out that the security to be acquired in the exchange offer is, in substance, either a right to acquire the security being distributed or is brought within the rule under paragraph b thereof; and Rule 10b–6 prohibits the purchase of such security during the distribution except through the exchange offer, unless an exemption is available.

Despite the reference in the Release to "a codification of existing interpretations under Rule 10b–6," neither the SEC

---

3. New York Stock Exchange Co. Manual, Section A2.

nor the parties to this action have cited any such precedents, nor have we found any. However, we do not find this lack of precedent crucial if Rule 10b–6 should independently be found to apply to purchases of stock while exchange offers for such stock are outstanding.

■ One of the primary purposes of Rule 10b–6 is to prevent an issuer of stock from manipulating the market for that stock. As the court stated in SEC v. Scott Taylor & Co., 183 F.Supp. 904, 907 (S.D.N.Y.1959):

> Manipulation was often accomplished by those about to sell securities or already engaged in selling securities bidding on the market for the same securities, thereby creating an unjustifiable impression of market activity which would facilitate the sale at artificially high prices. This was one of the practices which the Securities Exchange Act was designed to eradicate, and it is the practice which is covered by Rule X–10b–6. (Footnote omitted.)

See also, Weitzen v. Kearns, 271 F.Supp. 616, 623 (S.D.N.Y.1967); Miller v. Steinbach, 268 F.Supp. 255, 280 (S.D.N.Y. 1967); SEC v. Electronics Security Corp., 217 F.Supp. 831, 836 (D.Minn. 1963).

Bangor Punta argues that its purchase of Piper stock could only serve to drive up the price of Piper stock and thus to make the Bangor Punta shares offered in exchange appear less attractive—the opposite effect from that which Rule 10b–6 would normally seek to prevent. However, this argument overlooks the decided benefits that purchases of target company stock can produce for the initiator of an exchange offer. If the price of the target company's stock does increase in response to cash purchases by the exchange offer or after the offer has been announced, many shareholders in the target company are likely to assume that the price increase results solely from the bullish effect of the exchange offer on the market. Small investors especially would be likely to assume that the exchange offer was receiving serious attention and approbation from larger, more knowledgeable investors than they. The managements of either the target company or the offeror can compound this impression by announcing the number of shares of target stock acquired by the offeror since the initiation of the exchange offer. Absent some indication to the contrary, the target company shareholders would be likely to assume that the entire increase resulted from the offer, not from cash purchases in addition to the offer.

■ Prevention of this kind of manipulation seems well within the spirit of Rule 10b–6. It is within the letter of the Rule as well. As quoted above, part (a) of Rule 10b–6 prohibits the issuer of a security not only from purchasing the issued security itself while offering it, but also from purchasing "any right to purchase any such security." Here the Piper shares carried the right to acquire Bangor Punta securities as a result of Bangor Punta's exchange offer. Consequently, we hold that Bangor Punta could not lawfully purchase these shares during the tenure of its exchange offer.

It remains open to Bangor Punta to demonstrate at trial that its purchases fall within the exemption provided by Rule 10b–6 for "unsolicited * * * purchases * * * effected neither on a securities exchange nor from or through a broker or dealer * * *." Moreover, we do not pass any judgment at this time on the question of what remedy is appropriate in regard to Bangor Punta's unlawful purchases of stock, nor on the significance of the fact that Chris-Craft itself purchased stock during an exchange offer prior to the SEC's warning.

We remand for further proceedings not inconsistent with this opinion.

MOORE, Circuit Judge (concurring in part):

I concur in the affirmance of the order denying a preliminary injunction. Under customary procedure, the issues framed by the pleadings would come on

for trial. Upon such facts as might be developed upon such a trial and the conclusions of law found to be applicable thereto, the case would come before us on appeal. In this case, however, the majority, in effect, give their conclusions of law before trial and appeal.

Quite apart from giving the trial court an opportunity to fulfill its role in arriving at a decision, the majority, in their advisory opinion, misconstrue, I believe, the May 8th press release and Rule 135.

There should be little doubt that if the May 8th agreement had been misstated, a suit, alleging misrepresentation and fraud, would be before us. And yet any omission of the all important terms proposed would have been materially misleading. The exchange was to be for "Bangor Punta securities and/or cash having a value, in the written opinion of The First Boston Corporation, of $80 or more." This was "the basis upon which the exchange is proposed to be made," Rule 135(c) (4). The "offer to sell" exemption required this information. The most important element of "basis" was, of necessity, some indication as to value. $80 in cash needed no evaluation; the package of securities, not then final, had to have some equivalent measure. To say, as does the majority, that the "announcements that the package of securities offered by Bangor Punta would be valued at $80 oversteps the exemption and, therefore, makes the press release an offer to sell," turn a preliminary and informative press release, which advises the public of a forthcoming registration statement, into a prospectus would—or at least should—come as a shock to the S.E.C.

As to the stock purchases by Bangor Punta during its exchange offer, the age-old question is again presented: does a rule or statute merely codify an existing decision-made rule of law or does it create a new rule? The very fact that Rule 10b–6 was to be quite prospective in operation is rather convincing that the latter is the proper conclusion.

In summary, I would affirm on the only issue before us, the denial of a preliminary injunction, and would withhold any other opinions until we have an opportunity to pass upon such future appeal as may come before us in this case.

ANDERSON, Circuit Judge (concurring) :

I concur in the affirmance of the order of the District Court, and in Judge Waterman's discussion of Rule 10b–6. I also concur in the holding that on May 8, 1969, the appellees were neither required nor permitted to disclose more than the fact of Bangor Punta's commitment to make an exchange offer of its securities to the Piper shareholders as part of an agreement to purchase the holdings of the Piper insiders, since the titles of Bangor Punta securities and the basis or ratio of this exchange were not yet established. For the reasons there expressed, the policies of regulation common to the federal securities laws require this resolution of the conflict between openness and reticence in disclosing specific details which is implicit in the dictates of the Securities Exchange Act of 1934 and the Securities Act of 1933.

I would not concur, however, in any interpretation of the opinion which might be thought to suggest that disclosure of information relating to the $80 valuation estimate, specified in the insiders' sale agreement, would not be required under any circumstances because it would fail to satisfy the 1934 Act's standard of materiality, regardless of whether supervening restrictions of the 1933 Act are applicable. As Chief Judge Lumbard's dissent notes, the additional fact that Bangor Punta had committed itself to offer securities valued by a well-known investment banking firm at not less than $80 per Piper share, and to back this commitment with a conditional guarantee of the value of the securities already offered to the Piper insiders, might fall within the investor-oriented definition of materiality set out in relation to disclosure required by § 10(b) of the 1934 Act

and Rule 10b–5 in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2 Cir. 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The Court's holding, in which I concur, is simply that the possible application of disclosure principles discussed in that case is here "outweighed by the danger that substantial numbers of investors were misled by the figure's publication" in a manner violating Rule 135.

Were it necessary to consider the application of materiality tests to the $80 value term, the fact could not be overlooked that Rule 10b–5 applies to the disclosure of all material "information," 401 F.2d at 848, a category of data which may include some "matters which do not fall tidily into either the 'fact' or 'opinion' class." A. Bromberg, Securities Laws: Fraud—SEC Rule 10b–5, § 7.4 (6) (d), p. 187 (1969). But this case does not turn upon either the validity of the distinction between a material "event" and a mere "prediction or opinion" suggested in SEC Release No. 5009 (Oct. 7, 1969), or upon its application to these facts.

LUMBARD, Chief Judge (dissenting):

I dissent.

Although I agree with the majority's conclusion that a preliminary injunction is not warranted in this case, I cannot accept the interpretation given by my colleagues to those provisions of the securities laws invoked against Bangor Punta. In my view Judge Tenney was substantially correct in his rulings below, and his order should be affirmed.

This case turns on two events, the issuance of the May 8 press release and Bangor Punta's purchases of 120,200 shares of Piper stock from May 12 through May 24. I think that Bangor Punta acted properly in both situations. Not only was the May 8 release proper, but the parties could have done no less, for I read recent interpretations of the securities laws as imposing an affirmative obligation to disclose the matters announced in the release. As to the purchases of the 120,200 shares, Bangor Punta did not then know of any rule or interpretation precluding the transactions, and the Commission has at least twice passed up opportunities to enforce its "long-established" interpretation of 10b–6 against Bangor Punta. Although it was aware of the purchases when it was preparing its suit in the District Court for the District of Columbia, the SEC made no mention of them in the pleadings nor sought to enjoin Bangor Punta from further purchase in the consent decree. Later, the Commission approved Bangor Punta's registration statement without requiring any disclosure of alleged violations of 10b–6. For the SEC now to take the position that Rule 10b–6 prohibited the purchases represents a complete reversal of the position it had taken towards Bangor Punta until now.

### 1. *Section 5(c) and Rule 135*

It was entirely proper for Bangor Punta to enter into the May 8th agreement with the Piper family, as the family had every right to choose between takeover by Chris-Craft, Bangor Punta, or any other group.

Bangor Punta agreed to use its best efforts to acquire more than 50% of the Piper Common Stock. As "a part of such best efforts," it promised to "take all steps necessary to make a further exchange offer to all holders of Piper Stock * * *"; each share was to be exchanged for Bangor Punta securities or cash "having a value, in the written opinion of the First Boston Corporation, of $80 or more. * * *" There was a similar provision to safeguard the Pipers in that they would receive consideration worth at least $80. Thus, as they well may have had a right to expect, the other shareholders of Piper were assured substantially equal treatment to that received by the Piper family. See Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955); Andrews, The Stockholder's Right to Equal Opportuni-

ty in the Sale of Shares, 78 Harv.L.Rev. 505 (1965).

Bangor Punta and Piper immediately notified the Stock Exchange of this agreement and issued a press release on May 8. I think Judge Tenney was correct in holding that the press release was consonant with the Exchange guidelines for announcing material corporation developments and with the mandate of SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

In *Texas Gulf,* we reiterated our view that the securities laws should advance "the justifiable expectation of the market place that all investors trading on impersonal exchanges have relatively equal access to material information * * *." 401 F.2d at 848. It seems clear that if this principle is to be honored, the agreement with forty members of the Piper family, in conjunction with the decision to launch a tender offer, was material information requiring disclosure.

The majority intimates that the $80 figure was not a material fact, a suggestion with which I cannot agree. The test for materiality laid down in *Texas Gulf* is whether the fact is one to which "[a] reasonable man would attach importance * * * in determining his choice of action in the transaction in question." 401 F.2d at 849. On May 8 Chris-Craft was offering $65 for each Piper share in a taxable exchange; no reasonable man holding Piper shares on that date would find "unimportant" the fact that Bangor planned to offer, in the near future, a considerably more attractive package of securities, with a value of approximately $80.

To me, however, finding the fact material does not in every case compel disclosure, for the need for equal access to information does not automatically override competing policies of the securi-

ties laws as embodied in other statutory provisions and well-established regulations. Here, Rule 135 advances the basic principle that the prospectus and registration statement shall be the primary source of information during and before a contemplated offering, and only limited kinds of information can be released prior to filing.

The task of harmonizing regulations based on competing policies should of course be left to the SEC in the first instance. But when, as here, the Commission refuses even to recognize the existence of a conflict, we must strike the balance. Fortunately, our task here is not difficult, for there is language in Rule 135 which when read in the light of *Texas Gulf* authorizes the announcement.

Most of the May 8th announcement— the fact of the offering, the proposed date—was clearly authorized by Rule 135. While the $80 figure may seem more difficult to justify, under the circumstances its announcement was the only course open to Bangor Punta. Responding to the problem of valuation, Rule 135(c) (4) provides for notification of "the basis upon which the exchange is proposed to be made. * * *" Although not free from doubt, in the light of *Texas Gulf* I would read this provision as permitting announcement of the $80 figure.

The need for fair and equal access to information about the terms of a tender offer must be balanced against premature and incomplete disclosure of a securities offering in contravention of the registration and disclosure requirements underlying the 1933 Act. The conflict is sharply posed when, as here, the merger agreement sets only a value for the exchange package, with the underlying securities left to be determined later. When the securities to be offered are not specified at the time of the announcement, the investing public cannot even begin to make an independent evaluation of the offer [1] and perforce may tend

---

1. This situation must be distinguished from an agreement stipulating that the undetermined securities are to have a certain cash value. This can occur when the tendering company promises to offer only widely traded securities in its pack-

to react significantly but blindly to the unsupported dollar sum. Also, I realize there is a possibility for abuse, with companies employing this manner of agreement in order to gain the advantages of "jumping the gun."

Despite these considerations, it seems to me that here the need for disclosure was paramount. In addition to the forty members·of the Piper family and their agents, a large group of persons employed by independent firms, including accountants, escrow agents, banks, and printers, would of necessity work on the Piper agreement and so learn of the news. Not bound as insiders [2] or by the restraints of corporate trust imposed on employees of Piper and Bangor Punta, they would be free to trade upon this information, and with Piper trading at a considerably lower price on May 8, their response is easily foreseen. Even if under some legal or moral duty of restraint, a group this large could not be effectively policed or controlled. Further, the figure would rapidly spread; a dollar sum speeds the rumor as it is easily remembered and easily transmitted. Finally, Piper stockholders, thus apprised by the May 8 release of what they *might receive if they held their shares* rather than tendering to Chris-Craft, clearly benefited from the disclosure.[3] Chris-Craft can hardly complain that it was placed at a disadvantage by reason of Bangor Punta's higher bid and its ability to pay more; thus the law of the market place benefits the stockholders whose shares are sought.

On petition for rehearing, another factor compelling disclosure has been called to our attention. The so-called "tender offer" provision, section 13(d) (1) of the Securities Act of 1934, required Bangor Punta to file a detailed description of the May 8 agreement with the SEC within ten days, by May 18th. When timely filed, the description in accordance with section 13(d) (1) disclosed as an essential element of the Agreement that Bangor Punta planned a registered *offer to the public shareholders* of Piper, the offer to consist

> "of cash and/or securities having a value of at least $80 per share. Such value to be determined by The First Boston Corporation. * * * "

This wording is virtually identical to the May 8 announcement.

The 13(d) (1) statement was placed in the public files of the Commission, a repository over which, it is not unreasonable to assume, the keener investment houses maintain a close scrutiny. Thus, even if it be assumed that no "leaks" of the sort described above would have occurred, sophisticated investors within a few days would have obtained the $80 figure merely by a careful perusal of public records. The policies behind *Texas Gulf* command that such imperfect dissemination be corrected by broad disclosure through the public media, and Rule 135 must be read so as to permit such a course of action.

It is one thing to recognize the competing considerations and attempt to find a balanced solution and quite another to state flatly, as does the SEC, that the companies are under no duty to disclose. In its *amicus* brief, the Commission argues that Piper and Bangor Punta had no duty even to announce the fact of the agreement, let alone the price, since neither they nor any of their insiders were going to trade in the shares involved. I find this position wholly unrealistic and hardly designed to protect the other Piper stockholders. Simply

---

age; then, the market price of widely traded securities as of the date the exchange becomes effective determines the exchange ratio. There, the public is fully protected, and I can see no arguments against full and immediate disclosure.

2. The status of "insiders" as to all these people has not yet been established and

would raise difficult questions of enforcement.

3. Indeed, if the price had not been announced, a Piper stockholder who tendered his shares to Chris-Craft during the interim might well have grounds for an action against Bangor Punta and Piper.

put, Bangor Punta and Piper realized they were faced with one of "those situations which are essentially extraordinary in nature and which are reasonably certain to have a substantial effect on the market price of the security if [the extraordinary situation is] disclosed." SEC v. Texas Gulf Sulphur, 401 F.2d 833, 848. Disclosure was required.

Unlike the SEC, the New York Stock Exchange has tried to chart a course which accommodates the competing considerations. A Stock Exchange Rule adopted on July 18, 1968, in the wake of *Texas Gulf* in part provides:

> Negotiations leading to acquisitions and mergers, stock splits, the making of arrangements preparatory to an exchange or tender offer * * * are the type of developments where the risk of untimely and inadvertent disclosure of corporate plans is most likely to occur. * * *

> At some point it usually becomes necessary to involve other persons to conduct preliminary studies or assist in other preparations for contemplated transactions. * * * Experience has shown that maintaining security at this point is virtually impossible. Accordingly, fairness requires that the Company make an immediate public announcement as soon as confidential disclosures relating to such important matters are made to "outsiders."

> The extent of the disclosures will depend upon the state of discussion, studies, or negotiations. So far as possible, public statements should be definite as to price, ratio, timing and/or any other pertinent information necessary to permit a reasonable evaluation of the matter. As a minimum, they should include those disclosures made to "outsiders". * * *

NYSE Company Manual A–19 (July 18, 1969) (Addendum at 19–20). This standard seems to me a realistic solution to the problem.

I would hold that the May 8 announcement was proper, reflecting a fair accommodation of Section 5(c) and Rule 135 and the obligation to disclose material facts.

#### 2. *Rule 10b–6*

Nor would I find that any violation of Rule 10b–6 was occasioned by Bangor Punta's purchases of 120,200 shares of Piper stock between May 14 and May 23. To reach these transactions, the majority would stretch the wording of 10b–6 beyond anything that courts, commentators, and—in published actions—the SEC had considered included until this case.

Rule 10b–6 seeks to prevent the manipulation of the price of shares which are the subject of a current or impending public offering. It is concededly a highly technical rule, and, as the Commission explicitly noted at its adoption, it covers only a limited number of undesirable practices:

> The Rules [10b–6, –7, –8] do not purport to cover every possible type of manipulation or deceptive activity. The fact that a particular activity is not specifically dealt with or prohibited in such rules does not necessarily mean that it is not unlawful under the Act or the Commission's other rules.

SEC Securities Act Release No. 5194 (July 5, 1955). The practice particularly condemned is the offering company purchasing its own shares on the market, thereby buoying up the market price close to that set in the public offering. As is so often the case in the field of securities laws, there are a host of other, closely related transactions having the same manipulative effect on the tender offer which are also barred by the Rule. For example, section (b) controls the situation where the offering in prospect involves warrants; there, the issuer cannot purchase those of its shares represented by the rights. It seems to me improper to extend this sort of technical, limited and consistently interpreted rule to a common practice which until now has never been thought within its ambit.

As an original matter, it might be desirable to prohibit a tendering com-

pany from purchasing the target company's shares, but the proper way to accomplish this end, taken by the Commission with its new Rule 10b–13, is to adopt a new rule rather than stretch an established one beyond its recognized bounds. The Commission, however, seems not to have been content to wait until 10b–13 became effective to enforce its new policy. Rather, it invoked 10b–6 during the interim by a boot-strap operation, claiming in the release announcing 10b–13 that the proposed rule was "in effect, a codification of existing interpretations under Rule 10b–6. \* \* " I sympathize with the Commission's dilemma when, having announced a new policy, it cannot reach current transactions until the new rule becomes effective. But it seems to me that the cost of waiting will rarely be too great as the Commission presumably has lived with the offending practice for years; it expects us to make bad law to bail it out.

My belief that 10b–6 is being invoked here merely as a stop-gap measure is strengthened by several factors. Although the Commission claims that its position reflects consistent staff practice, I have found no published interpretations, either administrative or judicial, before the Release accompanying proposed Rule 10b–13 that indicate the Commission's view that 10b–6 reaches the shares of a target company. And discussions of the phrase "rights to purchase any such security" and of section 10b–6(b) by the commentators have been directed exclusively to the situations involving two securities of the same company, such as the distribution of a convertible debenture coupled with purchases of the underlying security. See, e. g., Comment, The SEC's Rule 10b–6: Preserving a Competitive Market During Distributions, 1967 Duke L.J. 809, 831; Disclosure Requirements of Public Companies and Insiders 138–142 (Flom, Garfinkel & Freund ed. 1967).

Significantly, the SEC did not see fit to apply its interpretation of 10b–6 to Bangor Punta, although it knew of the May purchases.[4] The final paragraph of the consent decree, entered on May 26, does not prohibit Bangor Punta from acquiring Piper stock other than through the exchange offer. Nor did the SEC require Bangor Punta to include an appropriate disclosure in its prospectus, as it clearly had the power to do,[5] of an alleged violation of its Rules, although Bangor Punta did mention the May purchases. Thus, I feel the SEC's own conduct casts doubt on its claim that "the Commission's staff has so construed the rule in similar situations."

Rule 10b–6 has until this case been a limited, highly technical rule. Despite the fact that a change in Commission policy cannot be put into effect for several months because of the procedural safeguards of the Administrative Procedure Act, the Commission now claims that we must reach the same result by accepting its interpretation, i. e., that the rule has meant this all along. I cannot believe that this practice is consonant with the standards of due process and elemental fairness long engrained in the operation of administrative law.

Since I conclude that Bangor Punta's purchases do not fall within the ambit of Rule 10b–6 as consistently interpreted

4. It may well be that the Commission's course of action was prompted by internal confusion. While Chris-Craft was warned on April 7th that the Commission would consider purchase of Piper stock while its tender offer was pending a violation of 10b–6, no such warning was ever communicated to Bangor Punta. When Chris-Craft abided by this prohibition, the Commission may have felt that its error had given Bangor Punta an inequitable advantage which it ought to seek to correct by the position it has taken in its amicus brief. I do not feel, however, that Bangor Punta—an equally innocent party—should be made to suffer for any failure on the part of the Commission or its staff. In any event, Bangor Punta acted within the law and consistent with the rulings of the SEC with respect to Rule 10b–6.

5. See, e. g., Northwest Industries Registration Effective, SEC News Digest, Issue No. 69–73 (April 17, 1969).

and universally understood as of May, 1969, and I do not believe the May 8th announcement was in violation of the securities laws, I would affirm Judge Tenney's opinion below.