**CHRIS–CRAFT INDUSTRIES, INC.,**
**Plaintiff,**

**v.**

**PIPER AIRCRAFT CORPORATION**
**et al., Defendants.**

**No. 69 Civ. 2227.**

United States District Court,
S. D. New York.

Dec. 10, 1971.

See also, D.C., 303 F.Supp. 191.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, by Arthur L. Liman, Joseph J. Ackell and Jack C. Auspitz, New York City, of counsel, for plaintiff.

Webster, Sheffield, Fleischmann, Hitchcock, & Brookfield, New York City, by James V. Ryan, William L. D. Barrett and C. Kenneth Shank, Jr., New York City, of counsel, for defendants Bangor Punta Corp., Nicholas Salgo and David W. Wallace.

Chadbourne, Parke, Whiteside & Wolff, New York City, by Paul G. Pennoyer, Jr., Zachary Shimer and Irene C. Warshauer, New York City, of counsel, for defendants Piper Aircraft Corp., William T. Piper, Jr., Howard Piper and Thomas F. Piper.

Sullivan & Cromwell, New York City, by John F. Arning, Roger L. Waldman and Charles W. Sullivan, New York City, of counsel, for defendants The First Boston Corp., Paul L. Miller and Nicholas A. Bayard.

## OPINION

POLLACK, District Judge:

*The Context of the Case*

This case and its companion cases [1] arise out of the unsuccessful attempt of Chris-Craft Industries, Inc: (Chris-Craft), a diversified manufacturer of recreational products, to secure control of Piper Aircraft Corporation (Piper), a leading manufacturer of light aircraft. The Chris-Craft takeover attempt was resisted by Piper and by a competitor for the control, Bangor Punta Corporation (Bangor Punta), which eventually succeeded in acquiring more than 50% of the outstanding Piper shares. The bulk of Chris-Craft's complaints is based on charges that Bangor Punta's success was achieved and Chris-Craft's failure and its asserted damages were caused by deception of the Piper shareholders and of Chris-Craft in violation of various provisions of the federal securities laws and regulations.

Only a minor segment of the case involves charges that Chris-Craft was directly deceived by Piper. The balance of the case deals with charges of deceptions alleged to have been committed by Piper and Bangor Punta on public holders of Piper stock to induce them not to accept Chris-Craft's offers to acquire their stock by purchase or exchange. Chris-Craft claims also that Bangor Punta privately acquired three critical blocks of Piper stock during the pendency of an exchange offer in violation of an SEC Rule.

1. Bangor Punta v. Chris Craft, 357 F. Supp. 1147, S.D.N.Y., which is being decided this day; and SEC v. Bangor Punta, et al., 331 F.Supp. 1154 (S.D. N.Y.1971) (Pollack, J.).

The contest for control of Piper was sophisticated and hard fought. The contenders were men accustomed to the handling of vast sums of public capital, were assisted by skilled professionals and were themselves seasoned in corporate tactics. It is not hard to detect personal overtones which added some passion and urgency to the contest. In addition, the conduct of both sides invoked the attention of the SEC and the New York Stock Exchange.

■ Thus, neither side can approximate itself to the position of an average public investor for whose express benefit, in dealing with others of superior knowledge (or the capacity to gain it), skill and resources, the law was designed. The Court does not intend to imply that contests for corporate control are to be unmediated by standards properly applicable under common law, federal legislation or regulation. However, substantial justice cannot be done by mere mechanical application of standards evolved to correct the imbalances of knowledge, skill and capacity for self-protection which so often occur in securities transactions between members of the public and professionals. Nor can the Court be indifferent to the ultimate source from which the damages are claimed, in effect. (See *infra*, 337–1146.

### The Major Events

Piper stock was listed on the New York Stock Exchange. There were 1,641,890 shares outstanding. Chris-Craft began purchasing Piper stock just before the end of 1968. By January 21, 1969 Chris-Craft had acquired 102,600 shares of Piper stock on the New York Stock Exchange. On the next day it increased its holdings by purchasing 101,100 shares at $65 per share from Technology Fund, a midwest-based mutual fund; this made Chris-Craft's holdings total 13% of the issue. The market for the stock was then in the low fifties. On January 23, 1969, Chris-Craft announced a cash tender offer for Piper shares of $65 per share and it obtained 304,606 shares through tenders. It also bought an additional 38,000 shares approximately bringing its holdings by February 3, 1969, to 547,-106 shares, a number barely short of one-third of the shares outstanding, at a cost of $34,677,000.

The Piper management (in essence the Piper family), which held some 31% of the outstanding Piper stock, reacted to the Chris-Craft tender offer by a communication to shareholders late in January to dissuade them from accepting the Chris-Craft tender offer. One of its statements complained of by Chris-Craft was that the Piper management considered the Chris-Craft $65 tender price inadequate. Chris-Craft charges that this was a misleading statement, based on the facts that Piper's investment bankers, First Boston Corporation, had advised Piper that a $65 price was fair and, furthermore, that on January 29, Piper had announced an agreement to sell 800,-000 unissued Piper shares to Grumman Aircraft Company at $65 per share.[2] The Grumman agreement was not consummated and the additional shares were not issued.

On February 27, Chris-Craft filed with the Securities and Exchange Commission ("Commission") an S–1 registration statement as a step in a proposed offer of exchange of a Chris-Craft package of securities for Piper stock. (The statement did not become effective until May 15.)

On March 22, Piper issued 469,199 authorized but unissued shares to acquire control of two companies, viz., Southply, Incorporated and United States Concrete Pipe Company of Florida. Apart from

---

2. Part of the agreement, not mentioned in the announcement, was an option in Grumman to "put" the shares back to Piper after six months at Grumman's cost plus interest. Piper insists that the "put" was part of an overall understanding that the proposed sale was a step in a possible Grumman-Piper merger, failing which Grumman might not be interested in a holding of Piper stock. The "put" was described in Piper's application to list the additional shares on the New York Stock Exchange.

increasing the number of shares outstanding, these acquisitions could make Piper less attractive to Chris-Craft since the Pipe Company was not in the recreational field and ownership of Southply, a speedboad manufacturer, might bring Chris-Craft into conflict with antitrust law. However, Piper rescinded both of these acquisitions within a short time. Piper had failed to comply with its listing agreement with the New York Stock Exchange by issuing such a block of shares before seeking the approval thereof of its stockholders. This omission led the Exchange to refuse the listing of the newly issued shares, to suspend trading in all Piper shares on the Exchange and to initiate delisting proceedings.

Following the rescission of both of these acquisitions, the Piper family revived negotiations with Bangor Punta, begun early in January, toward securing a defensive merger between Piper and Bangor Punta.

The discussions were fruitful. The Piper family agreed to exchange its 501,-090 shares for a package of Bangor Punta securities and Bangor Punta agreed to use its best efforts to acquire a majority of the outstanding Piper shares. Pursuant thereto, on May 8, 1969, Bangor Punta and Piper issued a release which made the usual joyful announcement of a fitting marriage, stating that the Piper family would receive Bangor Punta securities for their Piper shares and containing the following potent message:

> Bangor Punta has agreed to file a registration statement with the SEC covering a proposed exchange offer for any and all of the remaining outstanding shares of Piper Aircraft for a

package of Bangor Punta Securities to be valued in the judgment of The First Boston Corporation at not less than $80 per Piper share.[3]

Chris-Craft has attacked this release and has attacked also the registration statement referred to in the release. We deal later with those issues.

Bangor Punta entered the battle with several considerable advantages. It was sponsored by the management of Piper, it could look forward to the Piper family block [4] and, significantly, it alluded to a value figure of $80, exceeding Chris-Craft's cash tender offer and the values to be imputed to the Chris-Craft package. This was a serious blow to Chris-Craft. Accordingly, one day after Chris-Craft's exchange offer became effective, it added $10 to its package. Chris-Craft continued to acquire Piper stock until August, 1969, when it virtually ceased buying the stock. Through its succeeding exchange offers and together with its open market purchases, Chris-Craft had by then obtained 697,495 Piper shares, about 42%, while Bangor Punta, by early September, 1969, ended with slightly more than 50%. The contest for control was over except for the litigations questioning the actions of the parties along the way which has embroiled them in claims and counter-claims.

*Chris-Craft's Status Under the Securities Exchange Act*

Both sides have argued strenuously the question of Chris-Craft's standing to bring this action. Chris-Craft relies heavily on the language of the Court of Appeals in Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970), as precedent afford-

3. Shortly after this release was issued, the Commission, deeming the release to be a gun-jumping offer by Bangor Punta, sought in the U. S. District Court for the District of Columbia an injunction to prohibit further similar releases before effectiveness of the Bangor Punta registration statement. Bangor Punta and Piper, without admitting any of the allegations, consented to the issuance of an injunction.

4. One of the issues raised by Chris-Craft respecting Bangor Punta's acquisition of the Piper block relates to a guarantee by Bangor Punta to the Piper family that they would receive $80 for their stock if Bangor Punta acquired control. All parties agree that no similar guarantee inhered in the $80 value statement contained in the May 8 release.

ing it status. Defendants rely on Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) and related cases for the proposition that Chris-Craft has no right to sue.

Chris-Craft's claims fall into several categories, each requiring separate consideration of the question of standing to sue.

■ (a) Chris-Craft made purchases of Piper stock and claims to have acted on statements of Piper about its important product lines. Even though its purchases were not from Piper, it has standing to assert such claims. Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 968 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970).

■ (b) Chris-Craft seeks damages from Bangor Punta claimed to have resulted from the purchase by the latter of three blocks of Piper stock, totalling 120,-200 shares in May, 1969, during the pendency of their competing offers to Piper holders, in violation of SEC Rule 10b–6. Chris-Craft claims that these purchases enabled Bangor Punta to obtain majority ownership of Piper. It is held that Chris-Craft has standing to attempt to establish such a claim.

(c) Chris-Craft claims damages from the defendants on the charges that, during the pendency of Chris-Craft's attempt to take over Piper, Piper and Bangor Punta issued improper press releases and Bangor Punta filed a registration statement with material omissions and misstatements. Chris-Craft, which neither bought nor sold on the basis of the releases or registration, premises its standing to sue thereon on two grounds; one is an exception to the *Birnbaum* doctrine repeated in Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); the other is predicated on a recent amendment to the Securities Exchange Act of 1934.

The first theory is that Chris-Craft is in the position of a "forced seller" as a result of Bangor Punta's acquisition of a majority of Piper's stock. Chris-Craft emphasizes the decision of the Court of Appeals in Crane Company v. Westinghouse Air Brake Company, 419 F.2d 787, 797–798 (1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

In *Crane* the Court of Appeals distinguished *Iroquois Industries, Inc. supra,* (decided by the Court of Appeals five weeks prior to *Crane*—with rehearing denied by the Court of Appeals on the very day on which the *Crane* opinion was issued) by pointing out that plaintiff in *Iroquois* (a disappointed contender for control) was neither a buyer nor a seller, whereas in *Crane,* the disappointed contender was deemed a "forced seller". Chris-Craft claims to be a locked-in buyer which could sell only at a sustantial loss, and that it could not under state law (Pennsylvania) resist a merger, should Bangor Punta as majority holder, elect to effect one.

While the "forced sale" argument here rests on quite different grounds from those expressed by the Court of Appeals in *Crane,* Chris-Craft might be within the realm of reason in asserting itself to be a forced seller, should a merger of Piper be effected under Bangor Punta's control. However, no such merger has been proposed and the "forced seller" basis for standing to sue is in this case as compared with *Crane* of highly dubious validity.[5]

5. Crane Co.'s position as a forced seller was deemed to result from the fact that its target, by merging with a product competitor of Crane (Standard) made Crane an involuntary holder in its competitor and vulnerable to antitrust action. Crane thereupon sold out virtually all of the Standard holding acquired in the merger. It may be that one need not have looked beyond the merger itself to these special facts to deem Crane a forced seller. While the exchange effected in a merger has not been traditionally deemed by SEC to be a "sale" for registration purposes, it has been deemed a "sale" for purposes of invoking anti-fraud provisions.

The second theory on which Chris-Craft relies for standing to assert the matters relating to the press releases and registration statement is that Section 14(e) of the Securities Exchange Act affords it a right of action. Section 14(e), 15 U.S.C. § 78n(e), provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The *Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.* (Emphasis supplied).

This section was added to the '34 Act in 1968. The last sentence was added in December, 1970 (one year following the decision of the Court of Appeals, Second Circuit, in *Crane*).

In *Crane,* the Court of Appeals commented in dictum that Section 14(e) "should serve to resolve any doubts about standing in the tender offer cases, even where an offeror is not, as is *Crane,* in the position of a forced seller." 419 F.2d at 798–799. This comment may find support in Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 940 (2d Cir. 1969), where the target of a takeover bid, as well as that corporation's shareholders, were accorded standing to sue for alleged violations of § 14(e) occurring in the course of a control fight. Judge Friendly stated that the amendment which produced section 14(e), "In effect . . . applies Rule 10b–5 both to the offeror and to the opposition" and added that "except perhaps for any bearing it may have on the issue of standing, [the amendment is] only a codification of existing case law."

The conclusions herein reached as to Chris-Craft's 10b–5 claims will be dispositive of the merits of any claim based on § 14(e). Under the circumstances, the Court finds it unnecessary to decide whether § 14(e) may be separately invoked by one competitor for corporate control against another.

1. *Piper's shareholder letter and release of January 23, 1969*

(a) One of the attacks on these communications centers on the utterance by the Piper management of its view that the $65 Chris-Craft offer was inadequate. While the offer was some $13 above the current market price, it was considerably less than a Piper holder, biding his time, could have received at later stages of the contest.

Chris-Craft insists that the communications could not be read to refer to any inadequacy of the Chris-Craft offer other than in respect to price and—to establish Piper's bad faith and intention to mislead—it points out that

(1) Piper's own bankers had advised Piper that $65 per share was a fair price and

(2) the Grumman agreement contemplated a sale of Piper stock by Piper to Grumman at $65 per share.[6]

Any Piper shareholder with a telephone or a newspaper at hand could com-

6. We do not doubt that one of the reasons for the Grumman agreement was the effect its consummation would have on the number of shares outstanding and consequently on the number Chris-Craft would have to acquire to gain control. W. T. Piper, Jr. had no hesitancy in stating that the Grumman transaction "would give us additional shares" and that it "might make the . . . tender offer of Chris-Craft less attractive to our shareholders." A psychological effect may have been intended as well—to discourage Chris-Craft early in the game by facing it with the prospect of a heavier than anticipated commitment to the contest. As noted above, the shares were never issued.

pare the current market for Piper shares with Chris-Craft's offer. Thus, if the Piper statement of the inadequacy of the offer were intended to refer to price only it would be more fatuous than misleading. The more rational view is that the statement referred and was or should be taken to refer to other factors—such as Piper's management's views as to company prospects or as to the quality of Chris-Craft management, should Chris-Craft acquire control.

That Piper's management refrained in these releases from expressing fully its personal (and in all likelihood unflattering) opinions about Chris-Craft's management does not, in our opinion, fault the communications. And if the statements were intended to convey the impression that to resist Chris-Craft Piper's management would bend its efforts to procure a better alternative for Piper shareholders, the efforts were made and were, in terms of price to tendering shareholders, successful.

Chris-Craft makes the further assertion that it was itself, as a purchaser, misled by the announcement of the Grumman agreement. Chris-Craft claims that an indication that Grumman was willing to pay $65 (in the absence of disclosure of the "put"—see n. 2 supra) helped to justify its own decision to pay that much, indicated that Chris-Craft might have a willing buyer for its block, should it decide to unload, and led Chris-Craft to refrain from exercising its right to withdraw its offer if any material increase in outstanding Piper shares were proposed or made.

While the Court has no doubt that the Grumman agreement, the announcement and their timing were strategic moves, it cannot conclude that the agreement was a sham, or that the "put" provision was anything more than what Piper purports it to be—Grumman's "out" in the event that a Grumman–Piper merger did not materialize. These were all, under the circumstances, rational steps for the Piper and Grumman managements to take and the Court cannot hold that in taking its steps Piper

had any special duty to warn Chris-Craft (by disclosing the "put" or otherwise) not to gather comfort from the agreement price of $65 and not to rely on Grumman as a possible dumping ground for its shares of Piper.

Chris-Craft admits that Piper described the "put" aspects of the Grumman agreement fully in its application to the New York Stock Exchange for listing of the additional shares. Chris-Craft's contention therefore that, despite its efforts to obtain a copy of the Grumman agreement, it did not learn of it until April, 1969 when two Chris-Craft representatives were elected to the Board is not worthy of belief and can evoke little more than the additional response that it could have been more sedulous than it was to protect its already heavy and growing investment in Piper.

But the fatal blow to Chris-Craft's credibility on this issue is its action after April, 1969 when it claims first to have discovered the "put" provisions of the Grumman agreement. Between April 1 and August 18, Chris-Craft acquired about 150,000 additional shares of Piper. On May 16 it added $10 to its exchange package to compete with Bangor Punta. Such behavior with knowledge of the facts is inconsistent with a claim that knowledge would have caused Chris-Craft to change its course. Plaintiff's reference to SEC v. Great American Industries, 407 F.2d 453 (2d Cir. 1968), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969) (nondisclosure of finders' fees) is, under the circumstances, beside the mark.

(b) Chris-Craft has further criticized the communications for saying that Piper was in a growth industry and expected "to participate fully in this growth". The basis of its attack is in product problems faced by Piper in connection with a model then in development (Pocono) and one already on the market (Twin Comanche). These are discussed at greater length, *infra*. Here it is sufficient to point out that inherent in Chris-Craft's claim are the assumptions (1), that these problems would ef-

fectively prevent Piper from participating in the industry's growth—which it has not proved and (2), that this on-the-run response of Piper's management to Chris-Craft's foray into the Piper stock is to be tested by the standards applicable to a registration statement—a view which this Court rejects.

Chris-Craft's contentions as to the January Piper communications and the Grumman agreement must be and are rejected as unfounded.

## 2. The May 8th Release

This release is one of Chris-Craft's principal targets. Chris-Craft asserts that the release was in violation of the registration and prospectus provisions of the Securities Act of 1933, especially § 5(c) (15 U.S.C. § 77e(c)). This contention has the support of the SEC, which, in May, 1969, brought an action in the District of Columbia to restrain further releases of a similar character, with Bangor Punta consenting to a decree, and it has the support of the Court of Appeals of this Circuit, which held, in Chris-Craft Industries, Inc. v. Bangor Punta Corporation, 426 F.2d 569, 573–576 (2d Cir. 1970) that the release violated the registration requirements. The Court of Appeals nonetheless sustained the District Court's refusal to issue a preliminary injunction to prevent Bangor Punta from gaining and exercising control of Piper, but remanded the case for further proceedings.[7]

While the law of these injunction cases, as contended by Chris-Craft, may be that the May 8 release violated Section 5(c) of the Securities Act, that by no means disposes of the issue in the damage suit here being adjudicated.[8] Since Chris-Craft was not a purchaser of Bangor Punta stock it has no standing to invoke the provisions of Section 11 or 12(2) of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77l(2)) (material misstatements in or omissions from registration statements) or of Section 12(1) of the Act (15 U.S.C. § 77l(1)) (sales in violation of the registration requirements). The plaintiff's claim, to be actionable in this damage suit, must rest on other grounds.

As the Court of Appeals indicated, embodying the substance of the May 8 release in a full registration statement might have served to dispel possible erroneous interpretations of the release by those to whom it was addressed and ". . . would have eliminated the possibility, perhaps the probability, that some persons would have construed the $80 figure as referring to market value when that value was neither accurate nor intended." Chris-Craft v. Bangor Punta, per Waterman, J., 426 F.2d at 575.

7. Four opinions were written. Judge Waterman wrote the majority opinion for a full court (with Judge Friendly not participating). Judge Moore uttered strong doubts as to the majority's rejection of Bangor Punta's claim that the release was in conformity with SEC Rule 135, 17 C.F.R. § 230.135. Judge Anderson, who concurred in the legal conclusions of the majority, expressed separate views as to the materiality of the $80 statement. Judge Lumbard (then Chief Judge) could find no substance in Chris-Craft's legal claims as to Section 5(c), 15 U.S.C. § 77e(c), or Rule 10b–6, 17 C.F.R. § 240.10b–6 (to be discussed).

8. The issue in the "case" before the Second Circuit was whether an injunction should issue. The denial of an injunction was affirmed and it was left to the Trial Court to determine what, if any, conse-quences were to flow on remand from the views of the Court of Appeals as to the application of Section 5(c), 15 U.S.C. § 77e(c), of the Securities Act and Commission Rule 10b–6, 17 C.F.R. § 240.10b–6 under the Securities Exchange Act. The case before the District of Columbia Court was also one involving injunction, not damages, and Bangor Punta's consent to an order may well have been grounded on considerations other than the merits of the SEC's action. The "case" tried before this Court is radically different from the "case" considered on the appeal to the Second Circuit. Sometime after the decision on appeal, at a pre-trial hearing, Chris-Craft elected to abandon and announced the withdrawal of its claim for injunctive relief and stated that the plaintiff's sole claim was one for damages and accordingly that is the claim which is to be decided here.

It must be borne in mind that this is not an action by a former Piper shareholder who exchanged his stock for Bangor Punta securities, nor is it a suit for an injunction and equitable relief.

This is a case by a disappointed contender for control attempting to invoke a registration requirement designed for the protection of the public in order to obtain damages for itself because of a premature offer to sell. Yet Chris-Craft does not point to any damage to Piper holders occasioned by the premature release, nor has it adduced any evidence that the release was anything but true when taken in its own terms—as a statement that it was Bangor Punta's intention to offer a package which would be worth $80 in First Boston's judgment.[9] Even if the release were taken as a representation of future values, it should be noted that actual values reached by the Bangor Punta package were so close to $80 as to render any variance *de minimis.*[10]

■ Any claim of Chris-Craft that the violation of Section 5 *per se* induced enough Piper holders to accept Bangor Punta's offer to tip the balance of control in Bangor Punta's favor must be supported with proof that this resulted from the absence of the information which a full registration statement and prospectus would have contained. Chris-Craft has made no such showing. More-

over a showing that the acquisition of a particular block was enough to give Bangor Punta control would not by itself constitute proof that control would have fallen to Chris-Craft if Bangor Punta had failed to acquire that particular block. While the delay which might have occurred in the processing of a full registration statement by Bangor Punta might have given Chris-Craft extra time to forage about for Piper stock while Bangor Punta was preparing its statement for filing, Chris-Craft has adduced no proof that it was disadvantaged in this regard. *Cf.* 426 F.2d at 573.[11]

■ Chris-Craft did respond to the May 8 release by raising its bid. Its cost of acquiring Piper stock was thereby directly and immediately increased. But everything in this record is consistent with the conclusion that Chris-Craft would have done the same thing even if the substance of the release had been embodied in a fully cleared prospectus. There is nothing in this record which shows that the release was, in intent or effect, false or misleading as to Chris-Craft or the public.[12] Any increase in Chris-Craft's costs occasioned by the release was occasioned by its substance and not by the absence of a registration statement. Chris-Craft fully understood what the release was meant too convey. Chris-Craft is not entitled in this suit to the recovery of

9. The Court is familiar with instances in which exchange offers contemplate, and describe, formulas guaranteeing a market value for the securities to be given in exchange for the target company's stock. Such descriptions are common and leave no doubt as to their intentions. The language of the May 8 release could not be confused by reasonable men (much less professionals of the purported stature of Chris-Craft's witness on the point) with offers intending or implying guarantees of market value.

10. Based on various alternative methods of valuing the Bangor Punta package in the week following July 23, five days after effectiveness of the Bangor Punta exchange offer, the Bangor Punta package had a high market value of $79.93 and a low of $73.37. By contrast, using the

same bases, Chris-Craft's package in the period had a high of $75.50 and a low of $63.25.

11. "We do not understand Chris-Craft to allege that prior misdeeds of Bangor Punta so determined the course of the competition for shares after the date of the decision below that Chris-Craft was placed at any real disadvantage."

12. It must be borne in mind that the fact that a statement violates Section 5 of the Securities Act, 15 U.S.C. § 77e, does not necessarily connote that the statement is either false or otherwise misleading within the meaning of Rule 10b–5 upon which Chris-Craft relies. A thoroughly adequate disclosure—even a full registration statement—used in offers to sell before a required filing violates Section 5.

damages under Rule 10b–5 for the violation of Section 5.

### 3. The Bangor Punta Registration Statement [13]

Chris-Craft complains of the Bangor Punta registration statement covering the package of securities it was offering in exchange for Piper stock, alleging that material falsity in the statement was part of the scheme to divert Piper holders away from Chris-Craft.

The principal attack is on the figure at which Bangor Punta carried its holdings (almost 100%) of the Bangor and Aroostook Railroad (BAR). Bangor Punta carried the BAR stock on its books at $18.4 million—an unconventional figure in terms of transactional accounting, and one with a checkered history.

Historical cost of the BAR stock, less depreciation and other accounting adjustments, was $29.8 million. In 1965, in view of a then possible sale of BAR, Bangor Punta wrote the asset down to some $8 million. That sale did not materialize and the carrying figure was again revised (this time upward) to reflect an $18.4 million valuation of the BAR investment by investment bankers. The book increase resulting from this revaluation was credited directly to earned surplus (bypassing the income accounts).

There is no dispute as to this series of adjustments. The $18.4 million carrying figure is, however, attacked as materially misleading in view of a sale of Bangor Punta's interest in BAR, at $5 million (and additional contingent consideration) which did occur in October, 1969, a few months following effectiveness of Bangor Punta's registration of its Piper exchange package.

Chris-Craft asserts that the agreement to sell the road at that figure existed earlier and should have been reflected in Bangor Punta's registration statement. The charge is that Bangor Punta post-poned formal contract and closing to avoid having to reflect in its registration statement a book loss of $13 million on the sale.

In SEC v. Bangor Punta, n. 13 *supra,* this Court concluded that there was no substance in similar allegations by the SEC regarding the BAR matter. We held, however, that the registration statement was unintentionally in error in failing to disclose the circumstances which rendered Bangor Punta's carrying figure of the BAR holding obsolete and misleading absent such disclosure. An injunction against further violation of the securities laws was sought by SEC in that case but was denied. However, the Court ordered that shareholders who accepted the Bangor Punta exchange offer be given an opportunity to rescind their exchange should they elect to do so because of the registration error. This result expressed the principle that a registration statement with a misleading effect should be corrected for those to whom it related, whether or not the error was made with intent to mislead.

■ But that result does not conclude the issue here. This is not a suit by a Piper shareholder claiming to have been damaged by the error in respect to the BAR or any other matter pertaining to the registration. Chris-Craft did not rely on or purchase under the registration statement filed in connection with the exchange of Piper shares for Bangor Punta securities and, for the following reasons, we cannot conclude that plaintiff merits, under the circumstances, any recovery under federal law on this branch of the case.

Chris-Craft's complaint with respect to the Bangor Punta statement is not based on the provisions of the Securities Act expressly designed for such complaints. Secs. 11 and 12, 15 U.S.C. §§ 77k and 77l. It does invoke the broad provisions of Section 10, 15 U.S.C.

---

13. A fuller discussion of this issue is contained in this Court's opinion in SEC v. Bangor Punta, et al., 331 F.Supp. 1154 (S.D.N.Y.1971) (Pollack, J.). Only highlight facts are here discussed.

§ 78j and Rule 10b–5, 17 C.F.R. § 240.10b–15, under the Exchange Act, and of Section 14(e), 15 U.S.C. § 78n(e), under that Act. It thus presents us with the question whether and to what extent these general provisions can fairly be construed to override the more specific ones prescribed to implement private actions in complaint of registration statements.

█ We have no doubt that a violation of the registration requirements can, also, be a violation of Section 10 (b) and 14(e) of the Securities Exchange Act. But the mere fact of a violation of registration requirements under the '33 Act does not automatically trigger Section 10(b) and Rule 10b–5. The reasons and basis for invoking the '34 Act provisions must exist independently. The essentials are material deception, some form of scienter and a causal relation between the deficiency and the harm complained of. These essential elements have not been established in this case. At a minimum, neither a form of scienter nor proof of causal effect was established here.

Chris-Craft does not, in this Court's view, stand in the position of the plaintiff in Mills v. Electric Autolite, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) as being entitled to ask the Court to disregard traditional requirements that a causal connection be shown between the claimed violation and the injury. The attack in *Mills* was on a proxy statement which did not adequately disclose the true interest of directors who recommended a merger. This omission directly affected the shareholders on whose behalf the suit in *Mills* was brought.[14] It was in that

particular context that the Supreme Court deemed sufficient a set of facts under which shareholders *could* be misled.[15] This does not aid Chris-Craft as it is seeking to recover because of the effect which a misstatement allegedly had on third parties.

A Piper holder's decision to tender to Bangor Punta and Chris-Craft's failure to acquire the shares of such a holder cannot be held to be so clearly tied to the registration statement as to obviate the need for proof which would, at least, indicate a causal connection producing damage to Chris-Craft.

Chris-Craft was indeed a Piper shareholder. But it did not exchange any of its Piper shares for Bangor Punta. Its complaint is solely that of a defeated contender for control and it has asked this Court for a money award in the absence of evidence establishing a reasonable probability that its defeat and damage were connected with the claimed violations. There is no proof that a single exchanging Piper shareholder would have refrained from the exchange *and* taken an offer for his shares from Chris-Craft instead of that from Bangor Punta. In a damage suit, as distinct from one for equitable relief, such proof is essential to sustain a 10b–5 claim. In effect, Chris-Craft seeks the windfall of a punitive award against Bangor Punta by assuming the role of defender of the public interest in the purity of the registration process. This role has already been assumed by the Commission and we could well expect it to be assumed by exchanging Piper holders if there were material harm to them.

Both *Crane* and *Mills, supra,* indicate that in a proper case "tendency to re-

14. See, J. I. Case Co. v. Borak, 377 U.S. 426, 428, 84 S.Ct. 1555, 1558, 12 L.Ed.2d 423 (1964), ("We consider only . . . whether § 27 of the Act authorizes a federal cause of action . . . to a *corporate stockholder* [arising from use of a misleading proxy statement]" (emphasis added)).

15. "Where there has been a finding of materiality, a shareholder has made a

sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills,* 396 U.S. at 385, 90 S.Ct. at 622.

sult" may be as good coin as "result" and "could" be as good as "did" in establishing a right of action. The evidence does not support a notion that the Bangor Punta registration statement presents such a case. Despite the language of *Crane,* the facts indicated that blatant manipulation (overt buying and covert selling) was used to "paint the tape" as Court of Appeals Judge Smith said. By this means a competitor for control (Standard) was able, on the crucial days of Crane's tender offer, to raise the price of target company (Westinghouse Air Brake) stock to a level which assured defeat of Crane's campaign. The character of the violation and the clear causal nexus were crucial to the *Crane* result. These characteristics have not been demonstrated here. In *Mills,* as pointed out *supra,* the suit was on behalf of and for protection of the class to which the proxy material was addressed and for which the proxy rules were designed.

Granting to Chris-Craft full standing to raise the issue of falsity in the Bangor Punta registration statement would, in this Court's view, permit it to do no more than it has done here— attempt to show what it has not been able to show, that as a matter of substance the claimed violations entitled it to money damages.

Nor does Section 14(e) in any way alter the result on the merits. Accepting, on its face, the dictum of the Court of Appeals in *Crane* that Section 14(e) "should serve to resolve any doubts about standing in the tender offer case, even where an offeror is not, as is *Crane,* in the position of a forced seller", 419 F.2d at 798, leaves open the questions of how the substantive standards of Section 14(e) are to be applied and what levels of proof are required to evoke their application.

Section 14(e) virtually tracks the language of Rule 10b–5, with certain notable exceptions, and our 10b–5 conclusions are dispositive of the issues as raised under Section 14(e). The differences in language are significant. Section 14 (e) refers to "fraudulent, deceptive, or manipulative acts or practices" whereas Rule 10b–5 makes unlawful "any act, practice or course of business which operates *or would operate* as a fraud or deceit on any person", Rule 10b–5(c) (italics added), and contains a prohibition against employment of "any device, scheme or artifice to defraud", Rule 10b–5(a) (language not present in Section 14(e)). In the context of the facts of this case, Section 14(e) adds no weight to contentions of Chris-Craft that it need not establish a nexus between the violations it charges and the damages it claims to have suffered.

In addition to the charge of deficiency in the registration statement based on the BAR carrying figure, Chris-Craft has alleged the failure of the statement to reflect the terms of outstanding institutional loans, the relatively favorable treatment to members of the Piper family in the exchange (see n. 4 *supra*) and a guaranty to a group of Piper holders (the "Bolles" group), ostensibly for tax purposes, of a resale price for the Bangor Punta package of not less than 32½% of the value thereof at the close of the exchange. The Bangor Punta prospectus, while it did not pinpoint each of the alleged deficiencies made it more than amply clear that special treatment was being afforded by Bangor Punta to management personnel of Piper—so that the willingness of these large holders to effect the exchange for Bangor Punta may have been conditioned by their personal advantages as well as their views as to the best interests of Piper. Thus Chris-Craft's charges, in essence that this motivation was not disclosed, resolve themselves into a dispute over adjectives. None of the registration errors, including the BAR item, went beyond mere negligent omission or misstatement of fact.

### 4. *Application of Rule 10b–6*

SEC Rule 10b–6 interdicts bids for or purchases of a security by or on behalf of the issuer of a security if the security is "the subject of . . . [a] distribution". Included in the prohibitions

are bids for or purchases of "any right to purchase any such security".[16]

Bangor Punta made three block purchases of Piper shares during the pendency of its exchange offer. It purchased 78,600 shares from Fund of Funds Proprietary Fund, Ltd. (Proprietary) and two blocks, totalling 41,600 shares, from Bay Securities Corporation and American Securities. Chris-Craft claims that all three blocks were purchased in violation of the Rule. Bangor Punta claims the benefit of an exemption from the operation of the Rule for the purchase from Proprietary. Rule 10b–6(a) (3) (2), 17 C.F.R. 240.10b–6(a) (3)(ii) (1971).

The application of the prohibitory provisions of Rule 10b–6 is not before us for *de novo* decision. The Court of Appeals has ruled that Bangor Punta's purchases violated the first sentence of the Rule. However, it left open two vital questions to be decided on the remand. One is whether the exemption contained in paragraph (a) (3) (2) of Rule 10b–6 is applicable. The other is the determination of what remedy is appropriate.

Paragraph (a) (3) (2) of Rule 10b–6 exempts

unsolicited privately negotiated purchases, each involving a substantial amount of such security [in distribution], effected neither on a securities exchange nor from or through a broker or dealer.

As stated above, Bangor Punta claims an exemption from Rule 10b–6 only for the Proprietary block. A literal reading of the exemption requires a finding that the Proprietary purchase, like the others, was not exempted.

Proprietary's functions appear to have been solely to execute transactions for its associated mutual funds.

The Proprietary purchase followed a visit by a Bangor Punta executive with officials of Proprietary in Nassau, and it appears further that Bangor Punta made a payment of 75¢ per share to London & Dominion Trust Company, Ltd., which acted as nominee for Proprietary's Piper holding.[17] Absent for other cogent explanation for the visit the facts seem to point fairly at a solicitation of the purchase from Proprietary as the reason for the visit. It is so found.

The Court has searched for substance in the 10b–6 contention behind the technical violation, in the context of a claim for damages rather than in a suit for injunction.[18] This search has not revealed

16. There is no dispute that, under the circumstances of this case Piper stock was, within the meaning of the Rule, a "right to purchase" Bangor Punta stock.

17. Chris-Craft claims that this was a commission payment. Bangor Punta asserts that it was a fee. Resolution of this issue is unnecessary. Commission payments are not prohibited by the exemption (except by implication from the exclusion of purchases through a broker). The status of the seller as broker-dealer as well as the "solicitation" involved in the Nassau visit are in themselves enough to deprive the transaction of an exemption under a literal reading of paragraph (a) (3) (2) of Rule 10b–6.

18. It has been suggested in some quarters that Rule 10b–6 is of doubtful application in cases such as the one at bar. The stock bought by Bangor Punta was Piper stock, not its own. Since it was embarked on a program of purchasing Piper and its self-

interest would cause it to seek to do so as economically as possible, it would have no reason to stimulate demand by others for or inflate the price of Piper stock. Its motivation would, therefore, be to adhere to rather than violate the purpose of Rule 10b–6. While Piper stock and not Bangor Punta stock was being purchased, the purchases fell within the Rule because Piper stock was exchangeable for the stock being distributed—i. e., Bangor Punta stock. Any rise in Piper would in effect depress the value of Bangor Punta securities offered in exchange. But even if the price of Bangor Punta's securities were somehow being stimulated that rise would be of no avail to Bangor Punta in the exchange. For market arbitrage would almost immediately raise the price of Piper to align it with the rising price of the Bangor Punta securities offered in exchange.

These considerations, however, are foreclosed to this Court by the Court of Ap-

such substance as to merit serious consideration of the charge as a basis for money damages.

■ Despite the failure of Bangor Punta's acts to match the literal prescriptions of the exemption, this Court cannot conclude that Chris-Craft has established any right to recovery under Rule 10b–6. Even granting that the block purchases resulted arithmetically in Bangor Punta's achievement of control, there is no basis for concluding that, absent Bangor Punta's acquisition of these blocks, Chris-Craft would have achieved its goal of control. Thus the record will not support a contention that Bangor Punta should, by reason of violation of Rule 10b–6, compensate Chris-Craft for the latter's failure to gain control of Piper.

1. Chris-Craft was not misled by the purchases of Piper stock effected by Bangor Punta during the "distribution" of Bangor Punta's stock in the Piper exchange. The primary purpose of Rule 10b–6 is to prevent bids or purchases by a distributor of securities which have a stimulating effect on the market. The Rule thus seeks to protect a potential buyer from paying a price for the security in distribution other than that set by untrammeled market demand or from being misled into believing that the market demand is wholly that of independent purchasers. See SEC v. Scott, Taylor and Co., 183 F.Supp. 904, 907 (S.D.N.Y.1959). Chris-Craft was not in that position. It knew that significant large blocks of Piper stock were in existence, that Bangor Punta was as anxious as Chris-Craft to acquire those blocks and that Bangor Punta's acquisitions (like its own) would place such blocks at a premium.

2. Was the public misled by Bangor Punta's acts? Here too there is not a scintilla of evidence that any Piper holder was misled. And the absence of such evidence may be explained by the fact that the acts of Bangor Punta here in question, while they did not comply with the literal terms of the exemption contained in paragraph (a) (3) (2) of Rule 10b–6, were nevertheless well within the spirit of that exemption. This is a root factor in determining whether the 10b–6 charge has real substance. For the exemption from the prohibitions of the Rule, in a vital sense, defines the basic purposes of the Rule by delineating the kinds of transactions which have little, if any, tendency to radiate a stimulating effect into the general market.

If we lay the transactions complained of against the intent behind the words of the exemption provisions it becomes clear that the block purchases fell within the intent of the exemption, if not within its words.

(i). Paragraph (a) (3) (2) requires that purchases, to be exempt, must be substantial. The obvious reason for this provision is to prevent fragmenting purchases in order to create the appearance of a spread of demand. There is no dispute that Bangor Punta's block purchases were of a substantial nature. There is no evidence that Bangor Punta fragmented its purchases or otherwise acted to produce or heighten a stimulating effect on the market.

(ii). A distributor's solicitation of purchases, while distribution is in process, may have the same effect as purchases by the distributor. It may create an appearance of demand which is artificial in fact. However, while we have concluded that the visit of a Bangor Punta executive to Nassau was to solicit a sale to Bangor Punta by Proprietary, it was not solicitation calculated to have the effect condemned by the Rule. There is no evidence that it was broadcast, or that it was otherwise radiated into the general market where it might have had the prohibited stimulative effect. And, even if the payment of 75¢ per share to Proprietary's nominee bank were deemed

peals which has found Rule 10b–6 to be violated and which remanded solely to have determined the question of the exemption and the appropriate remedy, if any, in the context of a suit demanding an injunction (which this no longer is).

to be part of the inducement to acquire the block, that fact does not change the local and unpublicized character of the entire Proprietary transaction.

(iii). A purchase on an exchange cannot be exempted. The reason is obvious —and casts a consistent light on the prime purpose of the Rule; a purchase on an exchange becomes a broadcast item and consequently one of the components of the price trend of the security. The purchases complained of were not effected on an exchange.

(iv). Purchases from or through brokers or dealers cannot, technically, be exempted. This element of the exemption has the same function as the requirement that the purchase not be made on an exchange. Brokers and dealers are constantly quoting, broadcasting and varying their quotes with indications of change in supply and demand. Thus a purchase from or through a broker or dealer, even though in the over-the-counter market, may have the same tendency to affect market price. But neither Proprietary (from which 78,-600 Piper shares were purchased) nor Bay Securities Corporation (from which blocks aggregating to 21,600 Piper shares were purchased) was a broker or dealer in the conventional sense. Both were "in-house" facilities of mutual fund complexes acting for the funds they served. As such they may well have had the policy of secrecy which characterizes the operations of many funds during the period of acquisition or disposition of blocks. It is a common mutual fund practice to report even significant trades under a "miscellaneous" and unidentified rudric until the intended amount to be purchased or sold has been reached—and then often only in periodic reports after the fact and merely as a change buried in a list of one hundred or more portfolio holdings.[19]

### 5. *Piper Product Problems*

 We deal here with the complaint of Chris-Craft that, as a purchaser of Piper securities, it relied to its detriment on statements of Piper rendered materially false and misleading because of certain vital omissions.

Piper, in its 1967 and 1968 annual reports and in certain other public statements, had issued optimistic reports about a new development (the Pocono plane) and about a principal product (the Twin Comanche) the latter accounting for a significant portion of its revenues. In fact, both of these products were facing serious problems. The Pocono depended for its successful development on an engine to be created by Avco Lycoming. Lycoming, despite its attempts to create one with the required horsepower, failed to do so. The Pocono project, whose continuation or abandonment was a subject of dispute within Piper, was in fact abandoned by Bangor Punta shortly after it acquired control.

The Twin Comanche, while it was extensively sold and used, had operating characteristics which required especial skill and alertness of the pilot for safe handling. At some time or other various governmental agencies had noted and commented on these characteristics and between its inception in 1962 and May of 1969 the Twin Comanche had been involved in 62 fatal accidents resulting in over 130 deaths. Of the 62 accidents, 29 were the result of stall-spins—a propensity of the plane apparent from prior tests.

Chris-Craft complains of a 1967 annual report which described the Pocono as Piper's "major advanced research project", that indicated that the plane was undergoing flight tests, that deliveries of the plane were expected to begin in 1970 and that plans were in progress to build a plant in Florida for manufacture of the product.

19. Some time after the occurrence of the events litigated in this case the SEC adopted Rule 10b–13. That Rule interdicts (with exceptions not here pertinent) any purchase by a tender or exchange offeror otherwise than through the tender or exchange. It is a *post hoc* regulation which cannot be applied here.

The specific criticism levelled against this report by Chris-Craft is as follows:

> Nowhere was the public cautioned that the plane being tested had only an interim engine, that Avco Lycoming had not yet delivered or manufactured the engine required for the plane, and that the success of the venture hinged entirely on the ability of Lycoming to produce an engine powerful enough for the Pocono to meet FAA certification requirements or that it had encountered difficulties and delays in doing so.

Piper, on its side, points to statements in its reports and in trade articles which it claims put the Pocono project in its proper perspective as an "experimental project" "being tested". It asserts that at no time until September, 1969, was there a discussion of abandoning the project, let alone a decision to do so. Piper points out also that as late as August, 1969, Lycoming said that it could produce, promptly, the required engine for the Pocono. And the testimony of Bangor Punta's chief executive indicates that cost (as well as engineering) was a significant factor in his decision to abandon the project. There is every indication that if the Pipers had remained in control, the Pocono would not have been abandoned.

We cannot find that Piper's statements, even when viewed in the light of subsequent difficulties and eventual abandonment of the Pocono project, could be deemed materially false as of the time they were made. Chris-Craft denies that it is exercising "hindsight". However, the problems it points to, viewed as of the time of Piper's statements, seem little different from those attending many eventually successful product developments. While it is not easy, in considering the Twin Comanche, to avoid interlacing into the issues of this case the general public policy of air safety, that must, in this Court's view, be done. Chris-Craft has not shown that adjusting the Twin Comanche would be so costly or that limiting the plane to use by experienced pilots would so seriously damage Piper's future as to require it to damage itself by the disclosures claimed necessary to avoid the charge of fraud.

The evidence is convincing that Chris-Craft's original decision to acquire Piper was made without knowledge of the Pocono and Twin Comanche problems— and avowedly with knowledge of little more than what was carried in standard reference sources available in brokerage offices. Despite the fact that by April, 1969 Chris-Craft had two representatives on the board of Piper it did not, it claims, learn of the Pocono and Twin Comanche problems until September of 1969. By then, its purchasing was over and Bangor Punta was in control.

However, the record affords considerable support for the conclusion that Chris-Craft went into its stock purchasing with no concern about these product problems. The record fairly requires the inference that incidents involving the Twin Comanche and official reports on its operating characteristics could have been timely learned and timely appraised by anyone wishing and able to commit millions to a campaign for control of Piper. The claimed lack of knowledge or notice of product problems is not credited.

Chris-Craft asserts that it relied on Piper's statements (claimed to be misleading because of omissions) respecting the Pocono and Twin Comanche in making its heavy investment in Piper. However, Chris-Craft has not convinced the Court that these products, or what Piper said of them, were considered or material in Chris-Craft's investment decision. To demonstrate the materiality of the Pocono development, Chris-Craft asserts:

> Technology Fund, a mutual fund with no greater expertise about the aircraft industry than Chris-Craft, was Piper's largest record shareholder outside of the Piper family as of January 1969. . . . A Technology Fund research report dated November 19, 1968—more than a month before Chris-Craft's

first purchase of Piper—stated, in part:

At 52 Piper is adequately priced and little appreciation is expected until the anticipated extremely favorable third quarter. Quite possibly Piper could go to 18 times 1969 earnings, which produces a price of 63. However, at that level, it would be fully priced and sale would be in order except that before sale, the Pocono's outlook should be reviewed, as it really dominates Piper's future.

The demonstration shows more than it was intended to. As matters stood when the Technology Fund report was written, the Fund was not misled by Piper's reports. It appraised Piper as "adequately priced" at 52. A price of 63 would justify a sale unless a later review of the Pocono development might indicate otherwise.

Chris-Craft, within weeks after this report by the experts of the Fund, paid the Fund more than $6,500,000 to acquire some 101,000 Piper shares held by the Fund. With no more (and perhaps less) information *at the time* than was then available to the Fund's experts it over-anticipated the Fund's most bullish possibility of market value ($63) based on earnings reports and bought deep into the future of Piper and, it claims, Pocono. The "materiality" of the Pocono development is amply demonstrated by this Fund report, but, significantly, materiality as a possibility to be closely watched, not one to be blindly bought. Chris-Craft did not rely on Piper's statements in this regard.

In balancing equities in suit by an ordinary investor this Court might weigh differently the competing duties of Piper's management: on the one hand, to avoid damaging the company by airing internal problems (which with respect to Pocono did not at the time foreshadow the ultimate abandonment of the project and, with respect to Twin Comanche, were not as irremediable as Chris-Craft wishes us to believe) and on the other hand, to avoid a misleading effect in its published statements. But Chris-Craft, under the circumstances of this case, does not merit a weighing in its favor of so delicate a set of duties. In effect, Chris-Craft's management is attempting on this issue to enlist the Court's aid in passing over to others the burden of a purported harm to Chris-Craft's shareholders which Chris-Craft's management could well have avoided by reasonable inquiry. The credible evidence adduced in Chris-Craft's favor does not warrant such a result.

*The Claim against First Boston*

First Boston and Paul L. Miller and Nicholas H. Bayard of First Boston (the "First Boston defendants") were joined as parties defendant herein. On the basis of the record, the Court cannot find that they committed, or engaged in any course of conduct which operated as fraud or deceit upon Chris-Craft or the public shareholders of Piper.

Indeed, were the record to support Chris-Craft's claims with respect to Piper and Bangor Punta (which it does not) the Court would be hard put to find any basis for extending liability to the First Boston defendants.

First Boston, in its capacity as an investment banker, rendered a variety of professional services to Piper Aircraft Corporation, Bangor Punta and members of the Piper family. In each case, substantive decision making power rested with and was exercised by these clients and not First Boston. First Boston was not responsible for the Piper letter to shareholders dated January 27, 1969. There is no evidence that it did more than contribute to the letter a suggestion within its area of expertise (investment prospects in the light aircraft industries generally), of which plaintiff does not complain.

The suggestions to Piper made by the First Boston defendants in respect to: the cash tender offer by Chris-Craft, the Grumman agreement, the press release concerning Grumman, the U. S. Concrete and Southply transactions, the May 8,

1969 agreement between Bangor Punta and the Piper family, the May 8, 1969 press release in connection therewith, the purchases by Bangor Punta of large blocks of Piper and the prospectuses on the Piper exchange offer, were a legitimate exercise of and limited to professional advice within the area of expertise of First Boston.

The activity of First Boston in the course of its professional relations with Piper, the Piper family and Bangor Punta does not render it responsible or liable for the actions of its clients. The record compels the conclusion that the First Boston defendants acted solely in the furtherance of what they believed in good faith to be the legitimate interests of their clients.

*The Relief Requested*

The Court of Appeals, with all Judges concurring, affirmed Judge Tenney's denial of a preliminary injunction and the case was remanded to the District Court for further proceedings not inconsistent with the majority's opinion. However, at a pre-trial conference, the plaintiff announced its election on the record to have its case considered as only a straight non-jury damage case rather than an equitable suit for injunction. No such case had been tendered to the Court of Appeals for consideration and the merit of Chris-Craft's suit in support of a damage claim was not before the Court of Appeals.

Chris-Craft acknowledges that its original attempt to have Bangor Punta divested of its majority control was a quest beset with inherent practical difficulty [20] and it gives this as the reason for now seeking damages only. In view of the conclusions reached by the Court on the issues raised by Chris-Craft, it is not necessary to pass on Chris-Craft's theory of computing the damages. However, an analysis of the damage issue

here raised will illustrate the anomalous consequences which may flow from according status to sue to disappointed contenders for control, even in cases with more substance and merit than are present in the case at bar.

Chris-Craft evaluates its damages in terms of the appraisal value of its Piper stock in the light of the ability of Bangor Punta to compel a merger at any time. Recognizing the wide disparity of opinion in respect to such value on the part of "experts", Chris-Craft suggests the possible use of the procedure used elsewhere,[21] permitting an aggrieved plaintiff to tender its shares to defendant at cost.

The proximate victims of virtually all the alleged violations of which Chris-Craft complains are one-time Piper stockholders who now hold Bangor Punta stock. These are the very people against whom Chris-Craft wishes us (by a judgment against their company) to assess many millions of dollars of damages in the form of a bail-out of Chris-Craft from its misadventure in Piper.

Were every allegation of Chris-Craft supported by the record, neither reason nor justice would permit such a result. Insofar as the Piper corporation is concerned, the results of assessing damages against it would be equally anomalous. It was the prize in the battle, not a contender. Its equity is held by three distinct groups: Bangor Punta, Chris-Craft, and a small public minority which did not tender shares in the various exchanges proffered. We have already pointed to the reasons for excluding Bangor Punta from the pale of liability. Chris-Craft, of course, would be bailed out if its theory of damages were accepted. This leaves the nonexchanging Piper holders. This is the category of holders intended to be protected. There is no stretch of reason or justice which could conceivably draw

20. Among other things, Chris-Craft asserts that changes effected in Piper under Bangor Punta control render Piper a different company from that into which Chris-Craft bought.

21. Gottlieb v. Sandia Amer. Corp., 304 F. Supp. 980 (E.D.Pa.1969).

them indirectly into the circle of liability. See, SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, at 867 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), sub nom., Coates v. SEC, Kline v. SEC.

However, even properly chosen defendants must be shown to be more than putatively liable. That has not been done with respect to any defendant named by Chris-Craft herein.

While the details of every issue and argument in Chris-Craft's case have not been discussed herein, they have been considered and have not been found to warrant a judgment for Cris-Craft against any of the defendants.

The complaint against the corporate defendants, Bangor Punta and Piper, is dismissed and on the basis of the findings and conclusions herein expressed, the complaint is *a fortiori* dismissed as to all personal defendants.[22]

*Counterclaim of Piper Aircraft*

Piper has asserted a counterclaim against Chris-Craft charging that the latter violated Sections 13(d) and 14(e) (as well as 10(b)) of the Exchange Act.[23] This counterclaim repeats virtually all of the contentions made by the plaintiff in Bangor Punta v. Chris-Craft, 337 F.Supp. 1147, S.D.N.Y., which is being decided this day. Piper asks this Court to "fashion an appropriate equitable decree to deprive Chris-Craft of the benefit of its violation."

Piper was the unwilling target of Chris-Craft's bid for control of Piper. To avert what it deemed to be a raid by Chris-Craft, it invited Bangor Punta to compete with Chris-Craft. Bangor Punta acceded and (with the aid of the substantial blocks of Piper stock held by the Piper family and other significant cooperation of Piper's management) it won the contest. While both contestants may, today, be less than happy at the outcome, Piper was the prize, not a contender. The Court is at a loss to envisage any form of equitable (or other) relief to which Piper might in reason and justice be entitled. Piper's case against Chris-Craft, like Bangor Punta's rests shakily on surmise and speculation and much of it, even if sustainable, is irrelevant to any damage which Piper does or could claim.

The counterclaim of Piper against Chris-Craft is dismissed for failure to sustain the burden of proof thereof.

The foregoing shall constitute the findings and conclusions required by F.R.Civ.P. 52(a).

So ordered.

---

22. The agreed findings stipulated by the parties as such are found even if not fully covered herein, *non constat* many are evidentiary rather than findings of ultimate fact.

23. § 13(d), 15 U.S.C. § 78m(d) (1971); § 14(e), 15 U.S.C. § 78n(e) (1971); § 10(b), 15 U.S.C. § 78j(b) (1971).